CHARLES J. WHITE, CATHERINE WHITE *v.* HOUSEHOLD FINANCE CORPORATION.

[No. 2-473A92. Filed October 31, 1973.]

*Daniel J. Harrigan, Bayliff, Harrigan, Cord & Maugans,* of Kokomo, for appellants.

*Merton Stanley, Shirley & Stanley,* of Kokomo, for appellee.

## I.

## STATEMENT ON THE APPEAL

STATON, J.—Charles and Catherine White's nephew, Rickey L. Butzin, was under twenty-one (21) years of age. He wanted to purchase a 1968 Dodge Charger automobile. Charles and Catherine White signed a promissory note and security agreement so that the automobile could be financed. The 1968 Dodge Charger was destroyed in a single car accident. The insurance company paid $1,850.00 for the loss which was applied by Rickey L. Butzin and Household Finance Corporation to a second automobile, a 1969 Plymouth. Rickey L. Butzin defaulted upon his payments and Household Finance Corporation filed a complaint against Charles and Catherine White to recover $2,094.25 plus $10.20 interest due on the promissory note. The trial court heard the evidence and entered judgment for Household Finance Corporation in the sum of $2,094.25. The Whites' motion to correct errors presents this question for our review on appeal:

Did Household Finance Corporation's endorsement of the insurance check to Hendrickson Motor Sales impair the collateral thereby releasing the Whites on the promissory note *pro tanto?*

Our opinion concludes that the endorsement of the insurance check by Household Finance Corporation and the purchase of a second automobile was not a substitution of collateral but constituted an impairment of the collateral. We reverse the judgment of the trial court with instructions.

## II.

### STATEMENT OF THE FACTS

On October 5, 1970, Household Finance Corporation loaned Rickey L. Butzin $2,484.00 to purchase a 1968 Dodge Charger. The loan agreement was signed by Charles J. White, Catherine L. White and their nephew, Rickey L. Butzin, who was under the age of twenty-one. Also on this date, Charles White and Catherine White signed a security agreement covering the 1968 Dodge Charger. Rickey Butzin took out insurance on the Dodge Charger and had Household Finance Corporation named a beneficiary. This appears not to have been a requirement of Household Finance Corporation. The title to the Dodge Charger was in the names of Charles J. White and Rickey Butzin and showed a lien in favor of Household Finance Corporation.

In November, 1970, the Charger was destroyed in a single car accident. The insurance company paid Rickey Butzin and Household Finance Corporation $1,850.00. Charles White, Rickey Butzin and Household Finance Corporation released their respective interests on the title to the 1968 Dodge Charger. Upon receiving the insurance check, Rickey Butzin went to Household Finance Corporation to inquire about using the insurance proceeds to purchase a 1969 Plymouth. Without executing a new promissory note or security agreement, Household Finance Corporation endorsed the check

payable only to Hendrickson Motor Sales from whom Rickey Butzin then purchased a 1969 Plymouth with the $1850.00 insurance check. The title to the 1969 Plymouth was also in the names of Charles White and Rickey Butzin with Household Finance Corporation listed as a lienholder. Mr. and Mrs. White were not notified by Household Finance Corporation or their nephew, Rickey Butzin, that the insurance check had not been applied to their loan until Rickey Butzin stopped making payments and Household Finance Corporation contacted the Whites about the delinquent note. The Whites refused to make payments contending that the insurance check should have been applied to their indebtedness, and Household Finance Corporation sued the Whites on the promissory note.

### III.

### STATEMENT OF THE ISSUE

The issue to be decided by this appeal is:

Was the endorsement of the insurance check to Hendrickson Motor Sales an impairment of collateral releasing the Whites on the promissory note *pro tanto* or was it a mere substitution of collateral?

Our opinion concludes that the release of the insurance proceeds was not a substitution of collateral but an impairment of collateral. We reverse.

### IV.

### STATEMENT ON THE LAW

The Whites contend that they are accommodation makers on the note which was also signed by their nephew, Rickey L. Butzin. They further contend that the release of the insurance proceeds to Hendrickson Motor Sales released them on the promissory note *pro tanto*.

We agree with the Whites' contention that they are accommodation makers under IC 1971, 26-1-3-415; Ind. Ann. Stat. § 19-3-415 (Burns 1964):

"Contract of accommodation party.—(1) An accommodation party is one who signs the instrument in any capacity for the purpose of lending his name to another party to it.

(2) When the instrument has been taken for value before it is due the accommodation party is liable in the capacity in which he has signed even though the taker knows of the accommodation.

(3) As against a holder in due course and without notice of the accommodation oral proof of the accommodation is not admissible to give the accommodation party the benefit of discharges dependent on his character as such. In other cases the accommodation character may be shown by oral proof.

(4) An indorsement which shows that it is not in the chain of title is notice of its accommodation character.

(5) An accommodation party is not liable to the party accommodated, and if he pays the instrument has a right of recourse on the instrument against such party."

It is clear from the record that the Whites signed the promissory note only to enable their twenty (20) year old nephew, Rickey Butzin, to buy a car.[1] Rickey Butzin testified:

"Q. Had you been to Household Finance before? Before you went in with your Uncle about financing the Charger or talked to them?

"A. Yes, I did, I talked to them about it.

"Q. And what did they say to you and what did you say to them?

"A. Well, they told me I had to have co-signers. I said Okay, and they explained everything to me about having to have a co-signer. I was only 20 years old.

"Q. And then you and your uncle Charles went in?

"A. Yes."

Mr. White testified as follows:

---

1. Under IC 1971, 34-1-2-5.5 passed by the 1973 General Assembly, a twenty (20) year old is no longer under a legal disability to contract:

"No contract, sale, release or conveyance executed by a person after reaching his eighteenth [18th] birthday may be avoided by him on the grounds that, at the time the agreement was executed, he was acting under a legal disability by reason of his age. Nor many [may any] legal disability by reason of age be asserted as a defense in an action to enforce a contract against a person who executed the agreement after reaching his eighteenth [18th] birthday."

"Q. How was it that you went down and co-signed this note for Rickey?

"A. Well, he wanted to buy that Dodge Charger and for him to buy the Dodge Charger he had to have co-signers. And, he got me as a co-signer, me and my wife.

"Q. Did you receive any compensation for co-signing?

"A. Nope.

"Q. Did your wife?

"A. Nope."[2]

The importance of determining the status of the Whites for the purposes of this appeal has been adequately expressed by J. WHITE and R. SUMMERS, UNIFORM COMMERCIAL CODE, 428-429 (1972):

". . . An accommodation maker's basic liability to a holder is identical to that of any other maker, . . . As we will see, however, surety status of an accommodation party may give him special defenses unavailable to the general run of parties on instruments.

\* \* \*

"A surety who has signed an instrument is like other parties in that he is generally liable in the capacity in which he signed. Unlike other parties the surety may have special defenses, for: (1) he is not liable to the party accommodated (3-415(5)) (even if his contract on the instrument would normally make him liable to such person); (2) he may be discharged if the holder 'releases or agrees not to sue' the party accommodated or extends

---

2. Household Finance Corporation's contention that the method of signing the note is determinative of the signor's status is erroneous. The Indiana Comment to IC 1971, 26-1-3-415; Ind. Ann. Stat. § 19-3-415 (Burns 1964) states:

"This section recognizes that either primary or secondary parties to a negotiable instrument may be sureties for other parties, and that *parol evidence is admissible to establish the suretyship relation without regard to the fact that the surety may have signed as maker, acceptor, drawer or indorser*." (Our emphasis)

Although this provision has not been interpreted by Indiana case law, other jurisdictions interpreting this provison of the Uniform Commercial Code have allowed proof by parol evidence. *Deems* v. *Wilson* (1966), 114 Ga. App. 341, 151 S. E. 2d 230; *Raby* v. *Commercial Banking Corporation* (1966), 208 Pa. Super. 52, 220 A. 2d 659 and *Jamaica Tobacco & Sales Corp.* v. *Ortner* (1972), 70 Misc. 2d 388, 333 N. Y. S. 2d 669.

the time for payment or otherwise 'suspends' the right to enforce his obligaton against the party accommodated, and (3) he may be discharged if the holder 'unjustifiably impairs any collateral for the instrument' (for example, fails to perfect a security interest)."

When a creditor releases or negligently fails to protect security put in his possession by the principal debtor, the surety is released to the extent of the value of the security so impaired. *Stewart* v. *Davis* (1862), 18 Ind. 74; *Sample* v. *Cochran* (1882), 82 Ind. 260; *Crim* v. *Fleming* (1885), 101 Ind. 154; *Owen County State Bank* v. *Guard* (1940), 217 Ind. 75, 26 N.E.2d 395.[3] This right to discharge is also available to any party to a promissory note with a right of recourse[4] under IC 1971, 26-1-3-606(1) (b); Ind. Ann. Stat. § 19-3-606(1) (b) (Burns 1964) which provides:

---

3. The White's counsel asserted in oral argument that the White's are entitled to discharge under the common law defense of alteration of contract recently set out in *Indiana Telco Federal Credit Union* v. *Young* (1973), 156 Ind. App. 483, 297 N.E.2d 434, 436:

"Indiana courts have long held that when a principal alters the terms of the contract without the consent of the surety, the surety is discharged, even if the alteration is to the benefit of the surety. . . ."

The Whites do not fall under this common law surety defense nor under its codified version in IC 1971, 26-1-3-606(1) (a); Ind. Ann. Stat. § 19-3-606(1) (a) (Burns 1964). Alteration of the contract giving rise to discharge of a surety entails either a change in the physical document itself or a change in the contract between the creditor and the principal debtor which creates a different duty of performance on the part of the principal debtor than that which the surety guaranteed. L. SIMPSON, HANDBOOK ON THE LAW OF SURETYSHIP, 330 (1950). No such changes are involved in the case at bar.

4. Official Comment 1 to § 3-606 of the Uniform Commercial Code states:

"The words 'any party to the instrument' remove an uncertainty arising under the original section. The suretyship defenses here provided are not limited to parties who are 'secondarily liable,' but are available to any party who is in the position of a surety, having a right of recourse either on the instrument or dehors it, including an accommodation maker or acceptor known to the holder to be so."

J. WHITE and R. SUMMERS, UNIFORM COMMERCIAL CODE, 434, n. 121 have interpreted "any party to the instrument" to include co-makers. See also the dicta in *Rushton* v. *U. M. & M. Credit Corp.* (1968), 245 Ark. 703, 434 S. W. 2d 81 stating that Uniform Commercial Code § 3-606 is broad enough to include makers and endorsers.

"Impairment of recourse or of collateral.— (1) The holder discharges any party to the instrument to the extent that without such party's consent the holder

(a) without express reservation of rights releases or agrees not to sue any person against whom the party has to the knowledge of the holder a right of recourse or agrees to suspend the right to enforce against such person the instrument or collateral or otherwise discharges such person except that failure or delay in effecting any required presentment, protest or notice of dishonor with respect to any such person does not discharge any party as to whom presentment, protest or notice of dishonor is effective or unnecessary; or

(b) unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse.

(2) By express reservation of rights against a party with a right of recourse the holder preserves

(a) all his rights against such party as of the time when the instrument was originally due; and

(b) the right of the party to pay the instrument as of that time; and

(c) all rights of such party to recourse against others."

Household Finance Corporation contends that the signature of Mr. White on the title to the 1968 Dodge Charger was a consent to release of the insurance proceeds. At common law and under IC 1971, 26-1-3-606 (1), *supra,* consent to the release of collateral operates as a waiver of a right to discharge. This consent may be given in advance by a consent to release of collateral provision in the instrument[5] or it may be given after the release of collateral.[6] However, there was no advance

---

5. *Reeves* v. *Hunnicutt* (1969), 119 Ga. App. 806, 168 S. E. 2d 663; *Etelson* v. *Suburban Trust Co.* (1971), 263 Md. 376, 283 A. 2d 408; *Liberty National Bank & Trust Co. of Savannah* v. *Interstate Motel Developers, Inc.* v. *Aetna Casualty & Surety Co.* (D.C. 1972), 346 F. Supp. 888.

6. There are no cases to this writer's knowledge regarding consent to release of collateral after the release. However, an express or implied consent to a prior unconsented extension of payment agreement between the creditor and principal debtor was held to be a waiver of any right to discharge. See *London Leasing Corp.* v. *Interfina, Inc.* (1967), 53 Misc. 2d 657, 279 N. Y. S. 2d 209; *A. J. Armstrong, Inc.* v. *Janburt*

consent to release of collateral provision in the promissory note signed by the Whites and Rickey Butzin. Also, there was no subsequent consent to release of collateral by the Whites. We cannot agree that the signature of Mr. White on the title to the 1968 Charger was an implied release of the insurance proceeds. As accommodation makers, the Whites are entitled to a right of subrogation to any rights in the collateral that the creditor obtains from the principal debtor. This right of subrogation has been described by L. SIMP-SON, HANDBOOK ON THE LAW OF SURETYSHIP, 370 (1950) as follows:

> ". . . The surety's right of subrogation attaches specifically to any security that the creditor obtains in any way as soon as he obtains it. Being an equitable right, it makes no difference that the security was obtained subsequent to the surety's promise and without the knowledge of the surety. . . ."

This right of subrogation has also been defined by the Supreme Court of Indiana in *Peirce* v. *Higgins* (1884), 101 Ind. 178, 180, as follows:

> "The surety's right to subrogation comes into existence with his contract; his rights flow from that contract and accrue when it is executed. His own acts may impair them; the acts of others can not. These rights continue in undiminished vigor from their inception until the termination of his liability. It needs no particular form of contract to create them, for they are created by law and are legal incidents of the undertaking. . . ."

See also *Gerber* v. *Sharp* (1880), 72 Ind. 553; *Fast* v. *State ex rel. Bd. of Comm. of the County of Allen* (1915), 182 Ind. 606, 107 N.E. 465; and *National Mutual Insurance Co. of Washington D.C.* v. *Maryland Casualty Co.* (1963), 136 Ind. App. 35, 39-40, 187 N.E.2d 575.

*Embroidery Corp.* (1967), 97 N. J. Super. 246, 234 A. 2d 737; *Matchett* v. *Winona Assembly & Summer School Assn.* (1916), 185 Ind. 128, 138, 113 N.E. 1; *Williams* v. *Boyd* (1881), 75 Ind. 286, 295 and J. WHITE & R. SUMMERS, UNIFORM COMMERCIAL CODE § 13-15, at 436 (1972).

The security agreement covering the 1968 Dodge Charger was between the accommodation makers, the Whites, and the creditor, Household Finance Corporation. Charles White's signing of the title to this first automobile did not involve the release of any subrogation rights and did not impliedly release any security Household Finance Corporation might later obtain from the principal debtor, Rickey Butzin. The rationale for this conclusion is discussed below.

## IMPAIRMENT OR SUBSTITUTION OF COLLATERAL:

The creditor has a duty to preserve security or collateral in his possession under IC 1971, 26-1-3-606, *supra,* and under the common law.[7] The standard of care that a creditor is held to respecting collateral is set out in IC 1971, 26-1-9-207(1) ; Ind. Ann. Stat. § 19-9-207(1) (Burns 1964) :

> "A secured party must use reasonable care in the custody and preservation of collateral in his possession. In the case of an instrument or chattel paper reasonable care includes taking necessary steps to preserve rights against prior parties unless otherwise agreed."

See also *First National Bank, Giddings* v. *Helwig* (1971), Tex. App., 464 S.W.2d 953, approving the use of this standard.

Although there are no cases in Indiana discussing impairment of collateral under IC 1971, 26-1-3-606(1), *supra,* the Georgia Court of Appeals in *Hunter* v. *Community Loan & Investment Corp.* (1972), 127 Ga. App. 142, 193 S.E.2d 55 has held that a mere substitution of collateral is not an impairment under the Uniform Commercial Code provision 3-606. In that case, the Defendant signed a note with his daughter

---

7. The common law is not displaced by the Uniform Commercial Code unless the Code expressly states that the common law rule is inapplicable. IC 1971, 26-1-1-103; Ind. Ann. Stat. § 19-1-103 (Burns 1964) states:

"Unless displaced by the particular provisions of this Act . . . , the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions."

for the purchase of a 1965 Mustang which was pledged as collateral. The purpose of the loan was to finance an automobile for the daughter. The automobile burned and the insurance company provided the daughter with a 1966 Mustang in substitution. The Georgia Court of Appeals held there was no unjustifiable impairment of the collateral since there was no showing of an increased risk to the unconsenting father by the substitution.

In the present case, however, Household Finance Corporation released insurance proceeds in the amount of $1850.00 so that Rickey Butzin could buy a second automobile. No security agreement was executed, but the title to the second automobile was placed in the names of Charles J. White and Rickey L. Butzin with a first lien shown to Household Finance Corporation. Impairment of collateral under IC 1971, 26-1-3-606, *supra,* is not limited to diminishment of the physical value of the property itself but has been extended to encompass impairment of the security interest in the collateral. *Shaffer* v. *Davidson* (1968), Wyo., 445 P. 2d 13; *First Bank & Trust Co., Palatine* v. *Post* (1973), 10 Ill. App. 3rd 127, 293 N.E.2d 907.[8] Failure to execute a security agreement preserving a security interest in collateral is an impairment rather than being a mere substitution of one type of collateral for another. Household Finance Corporation failed to execute a security agreement on the second automobile. Even though a second security agreement is not executed, there can be no impairment of collateral if the first security agreement is sufficient to cover a second auto-

8. See *Pancoast* v. *Century Homes, Inc.* (Okla. Ct. App. 1971), 8 U. C. C. 1289 to the contrary. Note also that *Philbrooks* v *McEwen* (1868), 29 Ind. 347 held that a creditor who accepts a mortgage as collateral does not release a surety by failure to record the mortgage. However, this is a pre-Code opinion and IC 1971, 26-1-9-207(1), *supra,* puts an affirmative duty on the secured party to use reasonable care which includes perfecting its security interest in collateral. *Shaffer* v. *Davidson* (1968), Wyo., 445 P. 2d 13; *First Bank & Trust Co., Pallatine* v. *Post* (1973), 10 Ill. App. 3d 127, 293 N. E. 2d 907.

mobile purchase or if the application for certificate of title showing a lien in favor of a creditor is sufficient to create a security interest. We will examine both of these exceptions and their applicability to the facts in the case before us.

*Sufficiency of the First Security Agreement to Cover the Second Automobile.* Under IC 1971, 26-1-9-204(1), Ind. Ann. Stat. § 19-9-204(1) (Burns 1964), a security interest does not attach until the debtor has rights in the collateral. It is arguable that the Whites did not in fact have an interest in the 1968 Dodge Charger to give as collateral since Rickey Butzin was expected by all the parties to make the payments to Household Finance Corporation and the car was purchased solely for the use of Rickey Butzin. However, assuming *arguendo* that Rickey Butzin intended to give his uncle an interest in the 1968 Dodge Charger by putting his uncle's name on the first title, the security agreement in the case at bar signed by the Whites is not sufficient to cover the second automobile. Although the security agreement signed by the Whites does contain an after-acquired property clause covering after-acquired "household and consumer goods," it does not give Household Finance Corporation a right to a security interest in consumer goods (except accessions) acquired by the Whites ten (10) days after Household Finance Corporation gave value. See IC 1971, 26-1-9-204(4) (b) ; Ind. Ann. Stat. § 19-9-204(4) (b) (Burns 1964). Even if the trial court determined that Mr. White has an after-acquired interest in the second automobile, the October 5, 1970 security agreement is not sufficient to cover this interest acquired over two months after Household Finance Corporation gave value.

The Whites did not agree to carry insurance covering destruction of the 1968 Dodge Charger for the benefit of Household Finance Corporation. Household Finance Corporation's right to the insurance proceeds do not arise under the security

agreement but under the insurance contract procured by Rickey Butzin naming them a beneficiary.[9]

*Sufficiency of the Application for Certificate of Title to Create a Security Interest.* The question of whether a title application showing a lien in favor of the creditor is sufficient to create a security interest has never been answered in Indiana. Other jurisdictions have held that applications for certificates of title are not sufficient to create such an interest. *Shelton* v. *Erwin* (8 Cir. 1973), 472 F.2d 1118; *In re E. F. Anderson & Son, Inc.* (M.D. Ga. January 10, 1973), 12 U.C.C. 567; *First County Nat. Bank & Trust Co.* v. *Canna* (1973), 124 N.J. Super 154; 305 A. 2d 442, *In re Reese* (E.D. Pa. 1960), 1 U.C.C. 450.[10] IC 1971, 26-1-9-203(1) (b); Ind. Ann. Stat. § 19-9-203(1) (b) (Burns 1964), specifically requires the following to create an enforceable security agreement:

> ". . . [A] security interest is not enforceable against the debtor or third parties unless
>
> \* \* \*
>
> "(b) the debtor has signed a security agreement which contains a description of the collateral. . . ."

Although the application for certificate of title is signed by the debtor and contains a description of the collateral, it is not the agreement of the parties but only evidence that there may be an agreement. IC 1971, 26-1-9-105 (1) (h); Ind. Ann. Stat. § 19-9-105(1) (h) (Burns

9. Household Finance Corporation might have a right to proceeds arising from the "sale, exchange or other disposition" of the 1968 Dodge Charger listed as security in the October 5, 1970 security agreement under IC 1971, 26-1-9-306(2); Ind. Ann. Stat. § 19-9-306(2) (Burns 1964). However, without a "loss payable clause," proceeds under IC 1971, 26-1-9-306(2), *supra*, do not include insurance proceeds. *In re Hunter* (S. D. Ohio 1971), 9 U. C. C. 928. See also, *Universal C. I. T. Credit Corp.* v. *Prudential Investment Corp.* (1966), 101 R. I. 287, 222 A. 2d 571 and *Quigley* v. *Caron* (1968), Me., 247 A. 2d 94.

10. There are foreign jurisdiction cases holding that an application for certificate of title designating a lien is sufficient to fulfill the requirements for a written security agreement. *In re Shelton* (E. D. Mo. 1972), 343 F. Supp. 43; *In re Mertz Estate* (Pa. Orphans' Ct. 1961), 1 U. C. C. 452. We reject this interpretation of Uniform Commercial Code provision 9-203(1) (b) for the reasons set out in this opinion.

1964), defines a security agreement as ". . . an agreement which creates or provides for a security interest." The Statute of Frauds provision in Article 9 of the Uniform Commercial Code, IC 1971, 26-1-9-203; Ind. Ann. Stat. § 19-9-203 (Burns 1964), although reducing formal requisites to a minimum, is stricter in its requirements than the Statute of Frauds provision in Article Two, IC 1971, 26-1-2-201(1); Ind. Ann. Stat. § 19-2-201(1) (Burns 1964), which requires:

> "Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. . . ."

Permitting an application for certificate of title to be sufficient for the purpose of satisfying Article Nine requirements and creating an enforceable security agreement would be, in effect, to adopt the standard in Article Two's Statute of Fraud provision.[11] This result was clearly not intended by the drafters of the Uniform Commercial Code. Comment 5 to § 9-203 of the Uniform Commercial Code states:

> "The formal requisites stated in this section are not only conditions to the enforceability of a security interest against third parties. They are in the nature of a Statute of Frauds. Unless the secured party is in possession of the collateral, his security interest, absent a writing which satisfies subsection (1) (b), is not enforceable even against the debtor, and cannot be made so on any theory of equitable mortgage or the like. If he has advanced money, he is of course a creditor and like any creditor, is entitled after judgment to appropriate process to enforce his claim against his debtor's assets; he will not, however, have against his debtor the rights given a secured party by Part 5 of this Article [Chapter] on Default. The theory of equitable mortgage, insofar as it has operated to allow creditors to

---

11. The application for certificate of title is certainly indicative of the agreement of the parties although it does not integrate that agreement by reference.

enforce informal security agreements against debtors, may well have developed as a necessary escape from the elaborate requirements of execution, acknowledgment and the like which the nineteenth century chattel mortgage acts vainly relied on as a deterrent to fraud. Since this Article [Chapter] reduces formal requisites to a minimum, the doctrine is no longer necessary or useful. More harm than good would result from allowing creditors to establish a secured status by parol evidence after they have neglected the simple formality of obtaining a signed writing."

The requirement of a signed, written security agreement rather than a mere indication of that agreement is mandated by Article Nine. A security agreement usually does more than create a security interest. It settles the important question of what actions by the debtor constitute a default. It is important that this question be settled by the parties at the outset since default is not defined by the Uniform Commercial Code. As in *Shelton* v. *Erwin, supra,* Household Finance Corporation has properly perfected a security interest in the second automobile under IC 1971, 26-1-9-302 (4) ; Ind. Ann. Stat. § 19-9-302(4) (Burns 1964). However, no underlaying security agreement exists. The Whites' right to be subrogated to the creditor's interest in the collateral has been impaired to the extent of the collateral released. If the Whites, standing in the place of Household Finance Corporation as subrogee, attempted to assert an interest in the collateral, they could be defeated by a trustee in bankruptcy for debtor's estate, *Shelton* v. *Erwin, In re Reese, In re E. F. Anderson & Son, Inc., supra;* by a subsequent judgment lienholder, *First County Nat. Bank & Trust Co.* v. *Canna, supra,* or by an administrator of deceased debtor's estate.

There is no evidence that Mr. White was instrumental in acquiring the second title in his name or even that he had knowledge of his name being placed on the title to the 1969 Plymouth until after the release of the collateral. Under these facts, there is no showing of the elements of either a waiver

or estoppel that would bar the Whites from claiming their right to discharge. See *Cleveland, Cincinnati, Chicago & St. Louis R. R. Co.* v. *Moore* (1907), 170 Ind. 328, 345, 355, 82 N.E.2d 52 and *Lafayette Car Wash, Inc.* v. *Boes* (1972), 258 Ind. 498, 282 N.E.2d 837, 839.

The judgment of the trial court should be and the same hereby is reversed with instructions to vacate its judgment dated January 3, 1973 and to enter a judgment consistent with this opinion.

Hoffman, C.J. and Sharp, J., concur.

NOTE.—Reported at 302 N.E.2d 828.