

I N T H E

# Court of Appeals of Indiana



FILED

May 24 2024, 9:11 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

Great American Insurance Company,

*Appellant-Defendant / Counterclaim Plaintiff / Third-Party Plaintiff*

v.

Cline Avenue Bridge, LLC, and United Bridge Operating, LLC,

*Appellees-Plaintiffs / Counterclaim Defendants*

v.

Figg Group, Inc., et al.,

*Appellees-Third-Party Defendants*

May 24, 2024

Court of Appeals Case No.
23A-PL-2162

Appeal from the Lake Superior Court

The Honorable John M. Sedia, Judge

Trial Court Cause No.
45D01-2008-PL-517

**Opinion by Judge Mathias**
Judges Tavitas and Weissmann concur.

**Mathias, Judge.**

[1] Great American Insurance Company ("Great American") appeals the trial court's entry of summary judgment in favor of Cline Avenue Bridge, LLC ("CAB") and United Bridge Operating, LLC ("UBO") (we refer to CAB and UBO collectively as the "Project Owners"). Great American had acted as a surety for hire in a construction project by issuing payment and performance bonds. CAB breached the underlying construction contract with the contractor, and the Project Owners and Great American entered into litigation over liability between them under the bonds. Eventually, Great American sought to recover only its attorneys' fees from the Project Owners, which request the trial court denied on summary judgment.

[2] Great American raises a single issue for our review, which we restate as whether the trial court erred when it concluded that Great American had no contractual or equitable basis upon which Great American could seek to recover attorneys' fees from the Project Owners.

[3] We affirm.

## Facts and Procedural History

In June 2017, CAB entered into a $134-million construction contract with Figg Bridge Builders, LLC ("Figg") for Figg to design and construct the Cline Avenue Bridge in East Chicago. The construction contract provided that, in the event CAB were to breach the contract, the "Contractor[, i.e., Figg] shall be entitled to . . . attorney's fees and costs" from any ensuing dispute. Appellant's App. Vol. 3, p. 76. The construction contract further provided as follows with respect to "Third Party Beneficiaries":

> Except with respect to the provisions of this Agreement pertaining to assignment, this Agreement is not intended to and shall not create rights of any character whatsoever in favor of any person other than the Parties to this Agreement, and the obligation[s] assumed herein are solely for the use and benefit of the Parties.

*Id.* at 88.

The construction contract prohibited Figg from assigning its rights or obligations under the contract without CAB's prior written consent. However, the contract made an exception for "any assignment to [Figg's] surety required in consideration for the Payment and Performance Bonds required under this Agreement . . . ." *Id.* at 90. And, in 2010, Figg had executed an indemnity agreement with Great American that assigned future construction contracts to Great American "to secure the obligations" and "any other indebtedness and liabilities" of Figg. Appellant's App. Vol. 4, p. 58.

[6]     Following execution of the construction contract, Figg obtained the required payment and performance bonds from Great American.[1] As relevant here, the performance bond required Great American to pay its obligation under the bond if CAB was not in default of the construction contract and after CAB had provided notice to Great American that CAB was "considering declaring" Figg to be in default. Appellant's App. Vol. 3, p. 196. The performance bond also reserved to Great American the right to hire a qualified and acceptable contractor to replace Figg and complete the project if CAB were to consider declaring Figg to be in default.

[7]     The performance bond did not state any provision that entitled a party in a dispute over payment under that bond to claim attorneys' fees from another party. *See id.* at 195-98, 203. Conversely, the payment bond stated that, if Great American failed to discharge its obligations to a claimant under that bond, Great American "shall indemnify the Claimant for the reasonable attorney's fees the Claimant incurs thereafter to recover any sums found to be due and owing to the Claimant." *Id.* at 200. The payment bond had no other provision for the payment of attorneys' fees. *See id.* at 199-203. Great American named CAB and UBO, one of CAB's members, as dual obligees to both bonds.[2]

---

[1] While the construction contract provided that Figg was to obtain the payment and performance bonds, the cost of those bonds was within the contract's "Cost of the Work," which was ultimately paid by CAB. Appellant's App. Vol. 3, pp. 48, 51, 144.

[2] Aside from the dual-obligee rider, the bonds issued by Great American were standard A312 documents issued by the American Institute of Architects. *See id.* at 183-91.

[8] CAB issued a notice to proceed with construction to Figg on July 10, 2017, which triggered a thirty-month schedule for substantial completion. Due to numerous delays, Figg failed to meet that schedule. The construction contract permitted CAB to assess liquidated damages against Figg for Figg's failure to meet the schedule, and the contract provided that such damages were CAB's "only remedy" against Figg for that noncompliance.[3] Appellant's App. Vol. 4, p. 126. But CAB did not assess liquidated damages against Figg, and Figg continued to perform under the construction contract.

[9] In April 2020, about three months after the expiration of the original thirty-month schedule and a few months away from Figg's anticipated completion of the bridge, CAB terminated the construction contract and instructed Figg to leave the project. CAB then hired a third party to complete the construction. The Project Owners also sought payment from Great American under the performance bond. However, as a result of CAB's termination of Figg without notice to Great American and CAB's hiring of the third party, Great American concluded that it had no liability to the Project Owners under that bond.

[10] CAB and Figg each alleged that the other had breached the construction contract, and their dispute proceeded to arbitration before a panel of arbitrators. Neither UBO nor Great American participated in the arbitration proceeding. In

---

[3] The construction contract further provided that Figg would be in default if substantial completion had not been achieved "by the Delay Default Date," which was six months after the target substantial-completion date. Appellant's App. Vol. 4, p. 126.

July 2022, the panel of arbitrators found that CAB had breached the construction contract and that Figg was entitled to a net judgment of $4.4 million in damages, costs, and attorneys' fees.

[11] Meanwhile, in August 2020 the Project Owners filed the instant lawsuit against Great American.[4] The Project Owners alleged that, as Figg had purportedly breached the construction contract, Great American was liable under the performance bond. Great American denied liability and filed counterclaims against the Project Owners. In relevant part, in its counterclaim Count 4, Great American alleged that CAB's wrongful termination of Figg and lack of notice to Great American of that termination had caused Great American to make payments to Figg and subcontractors in reliance on CAB's contractual obligations. In particular, Great American alleged it had advanced to Figg more than $14 million to fund completion costs and that it had paid more than $4 million in post-termination claims under the payment bond due to CAB's failure to disperse construction funds.

[12] Following the decision of the panel of arbitrators, in October 2022 Figg timely moved to have the trial court confirm the arbitration award, while CAB moved to have the award vacated. In February 2023, the trial court entered its order confirming the arbitration award and denying CAB's motion to vacate. The Project Owners and Great American then jointly stipulated to the dismissal of

---

[4] Figg was also a named party in the trial court, but it does not participate in this appeal.

all claims and counterclaims between them except for Great American's counterclaim Count 4.

[13] Thereafter, the Project Owners and Great American each moved for summary judgment on Great American's remaining counterclaim. In its summary-judgment filings, Great American abandoned its attempt to recover "the money it paid to support [Figg] or to satisfy Payment Bond claims," leaving only a demand to recover its own attorneys' fees. Appellant's Br. at 22. As to those fees, Great American argued that it was

> entitled to enforce the terms of the Construction Contract regarding the reimbursement of attorneys' fees and costs arising from [CAB's] default because [Great American] is an assignee of [Figg] to the contract, it has such enforceable rights through its equitable right of subrogation[,] and because the Construction Contract has been incorporated into the Bonds.

Appellant's App. Vol. 4, p. 34.

[14] After a hearing, the trial court entered summary judgment for the Project Owners. This appeal ensued.

## Standard of Review

[15] Great American appeals the trial court's entry of summary judgment for the Project Owners. Our standard of review is well settled:

> When this Court reviews a grant or denial of a motion for summary judgment, we "stand in the shoes of the trial court." Summary judgment is appropriate "if the designated evidentiary matter shows that there is no genuine issue as to any material fact

and that the moving party is entitled to judgment as a matter of law." We will draw all reasonable inferences in favor of the non-moving party. We review summary judgment de novo.

*Arrendale v. Am. Imaging & MRI, LLC*, 183 N.E.3d 1064, 1067-68 (Ind. 2022) (citations omitted). Questions of contract interpretation present legal questions that are particularly apt for summary judgment. *See Erie Indem. Co. v. Estate of Harris*, 99 N.E.3d 625, 629 (Ind. 2018).

The issue in this appeal is whether Great American is entitled to recover its attorneys' fees from the Project Owners. Our Supreme Court has made clear that "Indiana has consistently followed the American Rule" for recovery of attorneys' fees. *Loparex, LLC v. MPI Release Techs., LLC*, 964 N.E.2d 806, 816 (Ind. 2012). Under the American Rule, "a prevailing party has no right to recover attorney fees from the opposition" unless there is "statutory authority or an agreement between the parties to the contrary," or "an equitable exception." *Id.* (footnote omitted).

Great American does not assert a statutory basis in support of its request to recover its attorneys' fees. Rather, Great American contends that its status as a surety under the construction bonds enables it to assert both a contractual right and an equitable right to recover its attorneys' fees from the Project Owners.

## 1. Construction bonds are specialized surety instruments.

Much of Great American's brief on appeal is devoted to general principles of surety law, which Great American then uses to argue its rights vis-à-vis Figg

and the Project Owners. *See* Appellant's Br. at 24-28. We therefore initially address the differences between surety agreements and insurance, and we then make clear that, within the law of suretyship, construction bonds are specialized legal instruments.

We first reiterate the difference between suretyship and insurance. As we recently stated:

> Our Supreme Court long ago distinguished between suretyship and insurance, stating: "Insurance has been defined as a contract whereby one undertakes to indemnify another against loss, damage, or liability arising from an unknown or contingent event; whereas a contract of suretyship is one to answer for the debt, default, or miscarriage of another." *Meyer v. Bldg. & Realty Serv. Co.*, 209 Ind. 125, 133, 196 N.E. 250, 253-54 (1935). Though similar in some respects, "there is a very wide difference between the two kinds of contracts." *Id.* at 253; *see Ind. Univ. v. Ind. Bonding & Sur. Co.*, 416 N.E.2d 1275, 1285 n.6 (Ind. Ct. App. 1981) ("[T]he essential nature of the promises differ.").

> Insurance involves a bilateral contract by which one party (the insured) shifts its risk of loss to another party (the insurer). *City of Gary v. Allstate Ins. Co.*, 612 N.E.2d 115, 118 (Ind. 1993). Suretyship is a tripartite arrangement in which one party (the surety) guarantees that a second party (the principal) will perform its contractual obligations to a third party (the obligee). *Meyer,* 196 N.E. at 253. If the principal defaults on its obligations, the obligee may call upon the surety for performance, after which the surety may seek indemnification from the principal. *Damler v. Baine,* 114 Ind. App. 534, 51 N.E.2d 885, 888 (1943). Thus, the principal retains the risk of loss.

In this sense, as one oft cited treatise explains, "[a] surety bond is a financial credit product, not an insurance indemnity product." 4A Philip L. Bruner & Patrick J. O'Connor, Jr., *Construction Law* § 12:7 (2022).

> It is true that from the obligee's standpoint . . . a surety bond may be thought of as "insurance" against a default by the principal. However, this extra level of protection is really no different from that afforded to a beneficiary under a letter of credit or other similar credit arrangement. The obligee's perceptions of what it is acquiring when it purchases a surety bond do not alter the underlying nature of the transaction. Suretyship is a form of credit enhancement rather than a type of risk financing, e.g., insurance.

> Brunner [sic] & O'Connor, Jr., *supra*, § 11:5.

*Posterity Scholar House, LP v. FCCI Ins. Co.*, 205 N.E.3d 1018, 1022-23 (Ind. Ct. App. 2023), *trans. denied*.

[20] A party's status as a surety usually comes into legal effect when the principal is bound to perform an obligation to the obligee but fails to do so. *See, e.g.*, *id.*; *Town of Plainfield v. Paden Eng'g Co.*, 943 N.E.2d 904, 915 (Ind. Ct. App. 2011), *trans. denied*. Upon the principal's failure, the surety "undertakes to do that which the principal [wa]s bound to do . . . ." *Town of Plainfield*, 943 N.E.2d at 915. A surety whose obligations have been invoked by a principal's default may have special defenses against the obligee, such as impairment of collateral, but a surety cannot be liable to the principal. *See White v. Household Fin. Corp.*, 158 Ind. App. 394, 399, 302 N.E.2d 828, 832 (1973).

[21] One common type of surety arrangement occurs when a surety gratuitously offers collateral on behalf of a debtor to secure a credit opportunity for that debtor from a lender. For example, a father might offer land he owns as collateral to a lender in order to bolster his son's application for a line of credit. *E.g.*, *Devlin v. Horizon Bank*, ___ N.E.3d ___, 2024 WL 1897953, at *2 (Ind. Ct. App. May 1, 2024). In such an arrangement, should the debtor receive and then default on the line of credit, the lender will have recourse against the surety and the surety's collateral. *See id.* The surety, in turn, stands in the shoes of the creditor for recourse against the debtor. *See id.* at *5.

[22] These common types of gratuitous surety agreements enable the flow of credit in circumstances where lenders would otherwise be reluctant to extend that credit. Accordingly, our case law makes clear that gratuitous sureties are "favorite[s] of the law and must be dealt with in the utmost good faith." *Brooks v. Bank of Geneva*, 97 N.E.3d 647, 652 (Ind. Ct. App.), *aff'd on reh'g*, 105 N.E.3d 197 (2018), *trans. denied*. Among other legal advantages, this entitles "gratuitous or accommodation sureties . . . to a strict construction of the contract in their favor . . . ." *Garco Indus. Equip. Co. v. Mallory*, 485 N.E.2d 652, 654 (Ind. Ct. App. 1985), *trans. denied*.

[23] But the surety under a construction bond is not a gratuitous surety. Rather, it is a "surety for hire." *Id.* As Bruner & O'Connor, Jr. explain in their leading treatise:

> Compensated suretyship in the American construction industry arose in the late 1800s in response to the recognized need on

public projects: (1) to protect public treasuries against the significant risk of contractor default on uncompleted projects and (2) to protect subcontractors, laborers, and materialmen, who performed work or furnished materials to such projects at the request of the defaulting contractor, against financial injury due to nonpayment. . . .

Bruner & O'Connor, Jr., *supra*, § 12:5.

To achieve that first goal, sureties for hire in Indiana may issue a performance bond, which "guarantees the complete execution of the contract and all supplemental agreements." Ind. Code § 36-1-9.5-13 (2017). And to achieve the second goal, sureties for hire may issue a payment bond, which "guarantees the payment of all legal debts related to the construction of the project." I.C. § 36-1-9.5-12 (2017). Thus, performance and payment bonds "protect their obligees against the business risks of unexcused contractor default," including "contract nonperformance" and "nonpayment resulting in mechanics' liens or claims by unpaid subcontractors and suppliers." Bruner & O'Connor, Jr., *supra*, § 12:1. In turn, and although distinct from an insurance contract, "the contract of a surety for hire is viewed as *analogous* to an insurance contract." *Garco Indus. Equip. Co.,* 485 N.E.2d at 654 (emphasis added). This means that, unlike the contract of a gratuitous surety, any ambiguity in the contract of a surety for hire will be construed "against the surety and in favor of the person to be protected." *Id.*

And this points to another fundamental difference between construction bonds and other surety arrangements. Unlike our example above of a common gratuitous surety arrangement, where a lender might make a one-time extension

of credit at the front-end of the formation of the parties' tripartite relationship, in construction contracts, including the one here, the project owner usually releases project funds to the contractor periodically over the life of the contract. *See* Bruner & O'Connor, Jr., *supra*, § 12.72 n.5 (noting that a "monthly payment process" is the "basic approach" in the construction industry); *see also* Appellant's App. Vol. 3, pp. 60-61, 157-59. The surety in a construction project "is entitled to rely upon the obligee's presumed proper performance of its payment obligations under the bonded contract." Bruner & O'Connor, Jr., *supra*, § 12.72. And the obligee's failure to perform that obligation can serve as "an affirmative recovery for loss" by the surety against the obligee or "serve to discharge the surety's performance obligation" all together. *Id.* Thus, the surety in a construction bond protects not only the obligee (by ensuring completion of the work and the release of claims) but also the contractor and its subcontractors (by guaranteeing payment).

[26] With that background, we turn to Great American's arguments on appeal.

## 2. The plain language of the bonds did not entitle Great American to recover its attorneys' fees from the Project Owners.

[27] The instant action began when the Project Owners claimed that Great American had failed to satisfy its obligations under the performance bond following the alleged breach of the construction contract by Figg. However, after the trial court confirmed the arbitration panel's determination that CAB, and not Figg, had breached the construction contract, the Project Owners and

Great American agreed to dismiss all claims and counterclaims between them except for Great American's counterclaim Count 4. That counterclaim, in turn, sought recovery of Great American's outlays to Figg and its subcontractors under the bonds, which outlays Great American had made in reliance on CAB's contractual obligations. Then, during the summary judgment proceeding, Great American abandoned its claims to those alleged damages and instead sought to recover only its attorneys' fees.

[28] Thus, the instant action between the Project Owners and Great American has always been an action as to liability under the bonds. But neither of the bonds provides Great American with a contract right to recover its attorneys' fees from the obligee in a bond dispute between them. The performance bond did not state any provision that entitled a party in a dispute over payment under that bond to claim attorneys' fees from another party. *See* Appellant's App. Vol. 3, pp. 195-98, 203. And the payment bond's only provision on attorneys' fees required Great American to indemnify a claimant that recovers sums found to be due and owing to it, which is of course not helpful to Great American here. *See id.* at 200.

### 3. On the facts before us, Great American's status as a surety does not entitle Great American to claim Figg's contract right to recover attorneys' fees as its own right.

[29] Implicitly acknowledging that it has no direct contract right to recover its attorneys' fees, Great American contends that its status as a surety entitles it to an award of attorneys' fees from the Project Owners by way of Figg's right to

claim its attorneys' fees under the construction contract. Great American alleges two theories in support of this position. First, Great American notes that the bonds incorporated the construction contract. *See id.* at 196, 200. Second, Great American argues that, under the doctrine of equitable subrogation, it is entitled to stand in Figg's shoes and to make the same demands that Figg could have made. *See, e.g.*, *Bank of New York v. Nally*, 820 N.E.2d 644, 651-52 (Ind. 2005) ("The doctrine of equitable subrogation . . . arises from the discharge of a debt and permits the party paying off a creditor to succeed to the creditor's rights in relation to the debt.").

[30] Great American's arguments are nonstarters. Perhaps Great American could claim Figg's right to recover attorneys' fees had Figg breached the construction contract and Great American then stepped into Figg's role to complete Figg's obligations under that contract, and if Great American were then successful in an ensuing dispute with CAB over Great American's performance of Figg's obligations. But none of that happened here. Figg never breached its obligations under the construction contract, and Great American never stepped into Figg's shoes. Rather, it was CAB that breached, and it was because of that breach that Great American—pursuant to its direct obligations under the bonds, not an assumed obligation under the construction contract—made expenditures that it later alleged it should not have been required to make.

[31] Accordingly, the bonds' incorporation of the construction contract is irrelevant, as there is no language in the construction contract that enables Great American to recover its attorneys' fees here. And neither is equitable

subrogation a legitimate basis for such a recovery as, again, Great American never stepped into Figg's role under the construction contract.

## 4. Great American's reliance on a purported assignment is misplaced.

[32] Last, Great American argues that it is entitled to rely on Figg's right to recover attorneys' fees under the construction contract because Figg had a standing indemnity agreement with Great American. According to Great American, this indemnity agreement, which Figg and Great American had executed in 2010, demonstrates that Figg intended to assign all future construction contracts—and, thus, this one—to Great American in consideration for any later-issued bonds.

[33] But the indemnity agreement does not apply here. The indemnity agreement states that Figg assigned its future construction contracts in order "to secure the obligations" *of* and "any other indebtedness and liabilities" *owed by Figg* to Great American. Appellant's App. Vol. 4, p. 58. The indemnity agreement then states that it "become[s] effective," in relevant part, "only in the event of . . . any abandonment, forfeiture or breach or alleged breach of any contracts referred to in the Bonds . . . ." *Id.*

[34] The indemnity agreement secures to Great American a mechanism for Great American to recover liabilities owed to it by Figg. As such, it is not relevant here, as Great American never stepped into Figg's shoes due to the purported breach by Figg, and Figg has no liability to Great American.

## Conclusion

For all of these reasons, Great American had no contractual or equitable basis from which it could seek to recover its attorneys' fees from the Project Owners. Accordingly, we affirm the trial court's entry of summary judgment for the Project Owners.

Affirmed.

Tavitas, J., and Weissmann, J., concur.

ATTORNEYS FOR APPELLANT

Steven E. Runyan
Jason T. Mizzell
Kroger, Gardis & Regas, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES CLINE AVENUE BRIDGE, LLC AND UNITED BRIDGE OPERATING, LLC

Michael A. Wukmer
Jenny R. Buchheit
Nathaniel M. Uhl
Ice Miller LLP
Indianapolis, Indiana