**INDIANA UNIVERSITY, Appellant (Plaintiff Below),**

v.

**INDIANA BONDING & SURETY COMPANY, Appellee (Defendant Below).**

No. 2–1276A459.

Court of Appeals of Indiana, Second District.

Feb. 24, 1981.

Rehearing Denied April 21, 1981.

Alan H. Lobley, Charles E. Greer, Ice, Miller, Donadio & Ryan, Indianapolis, for appellant.

Robert C. Hagemier, Hagemier, Allen & Smith, Indianapolis, for appellee.

MILLER, Judge.

Indiana university (the University) brought this action against the Indiana Bonding & Surety Co. (Indiana Bonding) to enforce the provisions of two performance bonds executed by Indiana Bonding on behalf of Indiana Vendors, Inc. (Vendors). The University had granted Vendors two franchise contracts to place vending machines in buildings on the Bloomington and Indianapolis campuses. Vendors fell behind in its monthly commissions due the University on both contracts and ultimately was declared bankrupt. The University's claim in Bankruptcy Court against Vendors for the past due commissions was allowed in full. After a bench trial of the action appealed herein, the judge denied recovery on the Bloomington performance bond; however, he found a total liability, including pre-judgment interest, of $19,022.05 on the Indianapolis bond.

The University appeals the rulings on both bonds claiming it was entitled to recover on the Bloomington bond and, further, that an improper measure of damages was applied to the Indianapolis bond.

We affirm.

Specifically, the University claims five issues are before us:

*With respect to the Bloomington bond:*

(1) Was the evidence sufficient to support the trial court's finding that the agreement of the University and Vendors to extend the time of payment of past due commissions beyond the termination date of the original contract without notice to Indiana Bonding constituted a "new contract" which discharged Indiana Bonding from its obligation under the bond?

(2) Did the delay stemming from the University's failure to comply strictly with the default notice requirement in the performance bond sufficiently prejudice Indiana Bonding so as to discharge it from the bond?

(3) Was the University's obligation to provide notice of default by Vendors waived either by Indiana Bonding's failure immediately to deny any liability or by In-

diana Bonding's insistence that the University first pursue its bankruptcy claim before Indiana Bonding would discuss its obligation under the bond?

*With respect to the Indianapolis bond:*

(4) Was the allowance of the University's claim in bankruptcy *res judicata* precluding relitigation of the amount of Vendors's liability or, in the alternative, was Indiana Bonding estopped to challenge the amount of Vendors's liability due to Indiana Bonding's insistence that the University first pursue its bankruptcy claim?

(5) Was the award of damages supported by sufficient evidence?

## BLOOMINGTON BOND

A. *The Evidence Was Sufficient To Support The Trial Court's Finding That The Time Extension Agreement Was A New Contract Which Discharged Indiana Bonding From Its Obligation.*

At trial, pursuant to the University's request for special findings of fact under Ind.Rules of Procedure, Trial Rule 52, the judge entered the following findings of fact with respect to the Bloomington Bond:

"1. The Plaintiff entered into a contract with Indiana Vendors, Inc., for the latter to supply vending services to the Bloomington Campus, which contract was to become effective August 15, 1966.

2. The defendant issued a performance bond in the initial amount of One Hundred Thousand Dollars ($100,000), which bond became effective August 15, 1966, and for which a continuation certificate was issued annually until August 15, 1969.

3. That on August 4, 1970 a continuation certificate was issued on said bond covering the contract of August 15, 1966, reducing the penalty thereon to the amount of Sixty Thousand Dollars ($60,000), to become effective August 15, 1970.

4. Beginning in December, 1969, Indiana Vendors, Inc. was continually in default of its contract with the Plaintiff, due to the failure of Indiana Vendors,

Inc. to render payments as required by its contract with the Plaintiff; no payments being made for the periods ending after January, 1970, losses thereunder being incurred on a monthly basis.

5. Without notice to the Defendant, Plaintiff entered into a new contract with Indiana Vendors, Inc., which contract was entered into on August 21, 1970, the terms of which were to become effective August 15, 1970, and which contract provided for the payment of past due monies, with interest, for an extended period of time.

6. The Plaintiff's first notice to defendant of default of Indiana Vendors, Inc., occurred by way of Plaintiff's letter to Defendant, dated December 16, 1970, such notice coming one year from the date when such notice was due.

7. During the period August 21, 1970 through December 16, 1970, Plaintiff accepted payments from Indiana Vendors, Inc. pursuant to the terms of their contract of August 21, 1970.

8. That Defendant notified Plaintiff of Plaintiff's failure to comply with the ten (10) day notice provision of the bond, prior to Plaintiff's filing of proof of claim in the bankruptcy of Indiana Vendors, Inc."

Based upon the above findings the court concluded as a matter of law that the University was not entitled to any recovery under the bond.

The first specific issue which this Court considers is derived from the second paragraph of its Motion to Correct Errors which reads:

"2. The court's finding no. 5 [that the University and Vendors entered into a new contract extending Vendors time to pay the past due commissions] is not sustained by sufficient evidence in that there is no evidence that plaintiff entered into a new contract with Indiana Vendors, Inc. But the only evidence is an agreement to extend the time in which amounts that were due were to be paid."

The applicable test in reviewing this sufficiency challenge is whether there is any probative evidence to support the trial court's finding of fact. *Indianapolis Power & Light Co. v. Barnard*, (1978) Ind.App., 371 N.E.2d 408; *In re Marriage of Miles*, (1977) Ind.App., 362 N.E.2d 171. (Petit. to Tranf. pending.)

A review of the facts relevant to our determination in this regard reveals the following:

On August 4, 1966 the University and Vendors entered into a contract granting Vendors the exclusive franchise for all the vending operations on the Bloomington campus and, in return, the University was to receive a percentage commission on all vending sales. The contract became effective August 15, 1966, with an expiration date of August 14, 1971. Pursuant to requirements of the contract, Vendors sought a performance bond from Indiana Bonding.[1]

---

1. The pertinent part of the Bloomington bond provided:

"KNOW ALL MEN BY THESE PRESENTS: THAT WE, INDIANA VENDORS, INC., WHOSE PRINCIPAL OFFICE is located in the City of Indianapolis, State of Indiana, as Principal, and INDIANA BONDING AND SURETY COMPANY, of Indianapolis, Indiana, as Surety, are held and firmly bound unto THE TRUSTEES OF INDIANA UNIVERSITY OF BLOOMINGTON, INDIANA, as Obligee, in the penal sum of One Hundred Thousand Dollars ($100,000.00), lawful money of the United States of America, for the payment of which sum, well and truly to be made, we bind ourselves, successors and assigns jointly and severally, firmly by these presents.

WHEREAS, said Principal has entered into a written contract with said Obligee, dated June 3, 1966 under the terms of which Contract the said Obligee grants to the said Principal, exclusive rights to install and operate certain vending machines located on the Indiana University Campus, for a period commencing on the 15th day of August, 1966, in accordance with the terms of said Contract, subject, however, to the following express conditions:

*FIRST*: That in case of default, the Obligee will promptly, and in any event within ten (10) days thereafter, give written notice thereof to the Surety at its principal office at 815 Circle Tower, Indianapolis, Indiana.

*SECOND*: That no right of action shall accrue upon, to or for the use or benefit of anyone other than the Obligee named herein.

Vendors fell behind in its payments from the outset of the contractual period. Initially their payments were only a few days late. However, by November, 1969 their monthly payments to the University were falling behind by longer periods of time.[2] Apparently, Vendors felt it was losing money on the Bloomington contract because early in the spring of 1970 it requested a general price increase. The University rejected this request and by mutual agreement they terminated the contract effective August 15, 1970 (one year before the expiration date). On June 26, 1970 Indiana Bonding was notified of the contract termination and advised to cancel the performance bond on the Bloomington contract as of August 15, 1970. During this period Indiana Bonding was not given any notice of Vendors's delinquencies including its total failure to make payments due for the final seven months of the contract term.

Representatives of the University and Vendors met on July 27, 1970 to discuss methods of collecting the unpaid commissions estimated at $60,000. By a letter dated July 30, 1970, sent by John L. Carmichael, president of Vendors, to R.M. Priest, Director of Purchasing and Stores at Indiana University, Vendors proposed a plan to pay the accrued commissions by immediately forwarding a check for $5,000 and paying the balance by $5,000 monthly payments. In return Vendors would be allowed to accelerate payments when possible. Additionally, Vendors would furnish the University a bond equal to the total commission due. In closing this letter Mr. Carmichael stated his awareness that, as consideration for extending the time of payment, "a reasonable interest charge would no doubt be justified [and] the rate asked would conform to [the] current University policies in such matters." Mr. Priest responded, in a letter dated August 21, 1970, that the University would agree to an extension of time with the following conditions:

1. The rate of 7½% per annum would be paid on an amount of $60,000 which was the largest portion of the monies then due.

2. On the amount of $58,320.91, then due through June 20, 1970, would be added the balance of commissions due to August 15, 1970 which was the end of the contract period.

3. The first $5,000 payment plus any amount over $60,000 would be made

THIRD: That this obligation shall commence on the 15th day of August, 1966, and shall continue for a period of one year, at which time it may be renewed for successive one (1) year terms at the option of the surety."

While the performance bond referred to Indiana Bonding as the "Surety," it is important to note that the nature of its obligation was one of a "Guarantor." A guaranty is a collateral promise or undertaking by one person to answer for the payment of some debt or the performance of some duty in case of the default of another. *Orange-Co., Inc. v. Brown*, (1979) Ind.App., 393 N.E.2d 192; *Indianapolis Morris Plan Corp. v. Sparks*, (1961) 132 Ind.App. 145, 172 N.E.2d 899. The guarantor makes an individual promise, separate from the principal's promise, and is only secondarily liable. *Stewart v. Knight & Jillison Co.*, (1904) 166 Ind. 498, 71 N.E. 182; *Indianapolis Morris Plan Corp. v. Sparks, supra*. The guarantor's liability is contingent upon the principal's default and the guarantor only becomes liable when such default takes place and he is notified thereof. *See Bowyer v. Clark Equipment Co.*, (1976) 171 Ind.App. 431, 357 N.E.2d 290. Where one undertakes that his principal shall perform a contract which is collateral to the instrument executed to secure such performance, he is a guarantor and not a surety. *Hoosier Brick Co. v. Floyd County Bank*, (1917) 64 Ind.App. 445, 116 N.E. 87. *See* 38 Am.Jur.2d *Guaranty* §§ 14-16 (1968); 38 C.J.S. *Guaranty* § 6 (1943).

On the other hand, a surety is one who undertakes to do that which his principal is bound to do in the event that the principal fails to comply with the contract. *Hess v. J.R. Watkins Medical Co.*, (1919) 70 Ind.App. 416, 123 N.E. 440. As an original promissor and debtor, the surety joins in the same promise as his principal and is primarily liable. *La Rose v. Logansport National Bank*, (1885) 102 Ind. 332, 1 N.E. 805. *See generally, Timberlake v. J.R. Watkins Co.* (1965), 138 Ind.App. 554, 209 N.E.2d 909. Where the distinction between suretyship and guaranty is important, the law of guaranty will be applied; otherwise, the law of suretyship is equally applicable to the resolution of this case.

2. For example, Vendors's November, 1969 payment was 35 days late; its payment for December, 1969 was 31 days late; and its January, 1970 payment was 94 days late.

to Mr. Priest's office on September 1, 1970.

4. A payment of $5,000 would be made on the first day of each month until the complete amount of past due commissions was paid.

5. Vendors would have the privilege of accelerating payment when desired.

Mr. Carmichael accepted the counteroffer by endorsing the letter with his signature.

Indiana Bonding, still unaware of any default or of the new terms agreed to by the University Vendors, issued, on Vendors's request, a continuation certificate *on the original performance bond* with the penal amount reduced from $100,000 to $60,-000.

Returning to the legal question before us, we observe that the parties do not disagree with the settled rule that either a "new" contract or a binding change in the old to which Indiana Bonding did not consent would have discharged Indiana Bonding. Thus it was stated in *Lutz v. Frick Co.*, (1962), 242 Ind. 599, 602, 181 N.E.2d 14, 16:

> "There can be no question but that it is the settled law that any binding change in the principal's contract to which the guarantor or surety does not consent will discharge the latter from liability. *Miller v. Stewart* (1824), 9 Wheat. 680, 6 L.Ed. 189; *Crouch & Son v. Parker* (1919), 188 Ind. 660, 125 N.E. 453, 7 A.L.R. 1598. This Court stated in the latter case (p. 667 of 188 Ind., p. 456 of 125 N.E., and p. 1603 of 7 A.L.R.):
>
> '* * * It is a sound and well-settled principle of law that sureties are not to be made liable beyond their contract and any agreement with the creditor, which varies essentially the terms of the contract, without the assent of the surety, will discharge him from responsibility. * * *' "

Where, as here, the change in the principal's contract involves an extension of time, such change, to effect the discharge of the guarantor, must have been: (1) entered into without the guarantor's consent; (2) limited to a definite time period; (3) contained in a valid and binding agreement distinct from the original contract; and (4) founded upon good consideration. *Weed Sewing Mach. Co. v. Winchell*, (1886) 107 Ind. 260, 7 N.E. 881; *Cross v. Wood*, (1868), 30 Ind. 378; 38 Am.Jur.2d *Guaranty* § 92; 38 C.J.S. *Guaranty* § 75; *See Sample v. Martin*, (1874) 46 Ind. 226. In arguing that the time extension agreement considered herein did not discharge Indiana Bonding from its obligation as guarantor, the University claims only that the agreement lacked sufficient consideration to bind the parties.

In considering this claim, it is important to examine the obligations of the University and Vendors both before and after the agreement. Under the original contract the University lacked any right to interest on the past due commissions. Statutory pre-judgment interest of 6% conceivably could have been recovered from Vendors under the original contract through litigation. Acts 1879, ch. 24, § 3, p. 43 (current version at Ind.Code 24–4.6–103). But after the time extension agreement was executed, the University had a contractual right to 7½% interest on the past due commissions; a rate 1½% above the statutory pre-judgment interest level and, of course, 7½% more than was provided in the original contract. This interest benefit received by the University in exchange for its agreement to extend the time of payment was sufficient consideration to bind the parties.

Our conclusion is supported by early Indiana cases. A case closely on point is *Weed Sewing Mach. Co. v. Winchell, supra,* in which, without notice to the guarantor, a payment of a past due debt was extended by an agreement in which the debtor supplied the creditor with three notes each valued at $200, due 12, 24 and 30 months from the date of issuance with 8% interest on said notes and 10% attorney fees. In determining whether the time extension agreement discharged the guarantor, our Supreme Court referred to the general rule that "[g]uarantors and sureties are exonerated if the creditor by any act, done without their consent, alters the obligation of the principal in any respect, or impairs or

suspends the remedy for its enforcement." *Id.* 107 Ind. at 266, 7 N.E. at 884. The Court concluded that the new obligations of 8% interest and 10% attorney fees, for which the debtor was not obligated under the original agreement, constituted sufficient consideration discharging the guarantor. *See also Cross v. Woods, supra* (where a time extension agreement given by the creditor to the debtor in consideration of the advance payment of 4% interest in excess of the statutorily allowed 6% relieved the guarantor).

The University cites several cases in support of its proposition that the time extension agreement did not constitute a new contract. Actually, these cases are distinguishable since they hold, under the specific facts of each, the time extension agreement invalid for lack of consideration.[3] In *Davis v. Stout, supra,* the payee of a promissory note extended the time for payment by the principal-payor. The time extension agreement failed to obligate either the payor or his surety to pay any additional interest on the note or to perform any other obligations different from those in the original note.

Our Supreme Court noted that "[a]n agreement of compromise or of forbearance requires a consideration." *Id.* at 13, 25 N.E. at 863. The Court characterized the time extension agreement as not belonging

> "to the class of contracts in which a consideration is implied, nor do the recitals show a consideration; neither is there any extrinsic averment showing a valid consideration for the agreement of forbearance. The principal and interest of the note were due when the payments were made, and the agreement extending

the time of payment entered into; hence it is plain that the payors of the note neither did anything they were not already under a binding legal obligation to do nor undertook to do anything that they were not already bound to perform." (Citations omitted.)

*Id.* at 13, 25 N.E. at 863. It appears from the text of the opinion that our Supreme Court would have ruled otherwise had the time extension agreement assessed a higher interest rate than stated in the promissory note. However, the written evidence established that the interest rate charged in the original promissory note was not affected by the extension agreement, and therefore, the Court ruled such agreement invalid for lack of consideration.

As previously stated, the time extension agreement considered herein had to contain four elements to be a valid contract. The University argues only one element, sufficient consideration, was lacking. Utilizing the above law in reviewing the sufficiency of the evidence submitted to the court upon which it reached its Finding of Fact No. 5, we conclude the evidence was sufficient to demonstrate that the time extension agreement was supported by adequate consideration and constituted a "new contract" extending the time for Vendors's payment of past due commissions to the University. Therefore, it served to discharge Indiana Bonding from its obligation on the Bloomington bond.[4]

As a result of our affirmance of the trial court's resolution of this issue, consideration of the University's second and third issues is unnecessary.

---

**3.** The University cites and briefly discusses *Davis v. Stout,* (1890) 126 Ind. 12, 25 N.E. 862 as direct support for its argument. Three cases are cited (but not discussed) as being in "accord" with *Davis: Sterne v. Vincennes Nat'l Bk.,* (1881) 79 Ind. 598; *Sterne v. Bank of Vincennes,* (1881) 79 Ind. 549; *Carr v. Howard,* (1846) 8 Blackf. 190.

**4.** Professor Williston suggests three major reasons why a time extension agreement operates to discharge the guarantor. First, the principal and creditor have substituted a new contract for the original one with terms different from

those to which the guarantor assented. Second, the time extension agreement materially alters the guarantor's contract by increasing its risk. In prolonging the length of the obligation, the probability of the principal's default may increase, thus decreasing the principal's ability to reimburse or exonerate the guarantor. Third, the time extension agreement may impair the guarantor's right of subrogation to the extent he must answer for the principal's default. 10 *Williston on Contracts* § 1225 (3rd Ed., 1967).

## INDIANAPOLIS BOND

B. *The Allowance of the University's Claim in Bankruptcy Against Vendors is not Res Judicata and does not Preclude Relitigation of the Amount of Vendors's Liability.*

■ With respect to the Indianapolis bond the exact amount of liability was an evidentiary question before the trial court. It held that the determination of the amount of Vendors's liability in the bankruptcy proceedings did not constitute *res judicata*. In determining whether the trial court erred in so holding, we consider the following additional facts:

On May 29, 1968 the University and Vendors entered into a five year contract, effective July 1, 1968, providing it the exclusive franchise for vending operations at the University's Indianapolis campus. The University received a commission on all vending sales in return for this franchise. Pursuant to the contract, Vendors obtained a performance bond in the penal sum of $50,000 from Indiana Bonding effective on July 1, 1968 and terminating July 1, 1969. Indiana Bonding possessed the option of annual renewal of this bond and exercised the option twice with the bond finally terminating on July 1, 1971. In contrast to the Bloomington bond, this performance bond provided "[t]hat no modifications, omissions or additions in or to the terms of [the University-Vendors's contract for Indianapolis] or in or to the plans therefore shall in any wise effect the obligation of [Indiana Bonding] on its bond." [5] Further, the Indianapolis bond, unlike the Bloomington bond, did not require the University to give notice of Vendors's default on payments to Indiana Bonding.

From the outset of the term of the Indianapolis contract Vendors fell behind in its payments due the University. By August, 1970 Vendors's payments were nearly two months late. At a meeting of representatives of Vendors and the University in January, 1971, Vendors assured the University

that they would pay the past due commissions. In fact, Vendors did pay two of the three past due commissions; however, five more periods accrued for which no payment was made. After the University notified Indiana Bonding on January 21, 1971 of Vendors's default, Indiana Bonding informed the University that Indiana Bonding would contact Vendors to "see if they could get some commitment" to pay the past due commissions.

On March 3, 1971 Vendors filed a petition in bankruptcy and soon thereafter the University contacted Indiana Bonding. · At that time it requested the University to contact the bankruptcy receiver and to keep Indiana Bonding informed as to further developments with the proceedings. Later in May, 1971 Alvin York, associate counsel for the University, telephoned Indiana Bonding's counsel who advised York to file a claim in the bankruptcy proceedings, stating that such action on the part of the University was necessary before Indiana Bonding would discuss payment of the monies due under either bond. The University's proof of claim filed on May 11, 1971 in the amount of $88,737.18 ($61,764.73 on the Bloomington bond and $26,972.45 on the Indianapolis bond) was allowed in full in July, 1973.

Based on the above facts the University argues that the doctrine *res judicata* prevents relitigation of the amount of Vendors's liability in its suit against Indiana Bonding under the theory that the Bankruptcy Court had previously resolved that issue. For the reasons stated below we reject this argument and hold that the doctrine of *res judicata* did not prevent litigation of the amount of Vendors's liability.

■ In discussing this issue in their briefs, both parties refer only to the doctrine of "*res judicata*" without recognizing its two distinct branches: claim preclusion (bar and merger) and issue preclusion (collateral estoppel). *Indiana State Hwy. Comm. v. Speidel*, (1979) Ind.App., 392 N.E.2d 1172. Claim preclusion is applicable

---

5. As with the Bloomington bond, Indiana Bonding was denominated a "Surety" but actually

was a "Guarantor." See footnote 1, pp. 1278-1279, *supra*.

where "there is a final judgment on the merits in a prior case, which acts as a complete bar to a subsequent action on the same claim between the same parties or those in privity with them." *Rees v. Heyser*, (1980) Ind.App., 404 N.E.2d 1183, 1185. Issue preclusion controls "when a particular issue is adjudicated and put into issue in a subsequent suit on a different cause of action between the same parties or those in privity with them." *Id.* In advocating *res judicata* as a basis for reversing the trial court, the University represents that evidence of the bankruptcy proceeding was uncontradicted and, therefore, fulfilled the following requirements of *res judicata*:

1) The form of judgment was rendered by a court of competent jurisdiction.

2) The matter in issue in the second lawsuit was, or might have been, determined in the first lawsuit.

3) The matter adjudicated in the first lawsuit was between the same parties or the privies in the second lawsuit.

4) The judgment in the first lawsuit was rendered on the merits.

*Town of Flora v. Ind. Serv. Corp.*, (1943) 222 Ind. 253, 53 N.E.2d 161; *Rees v. Heyser, supra.* In the case before us however, we believe the trial court correctly decided it was not bound by the Bankruptcy Court's determination of the amount of Vendors's liability.

Our investigation of this issue begins with the general observation that the bankruptcy proceeding did not litigate the amount of Vendors's liability on the contract. Neither did this proceeding determine Indiana Bonding's liability under the bond and if liable, the amount of such liability.

We return to the specific question of the effect of a creditor's judgment against a principal in a subsequent suit between the creditor and the principal's surety and note such effect is a matter of divergent opinions. The case law is in "hopeless confusion" as "[t]he cases are in such conflict that they now seem to be irreconcilable." Ager, *Problem: The Effect on the Surety of a Judgment Against the Principal Solu-* tion: *The Due Process Clause*, 36 Ins. Counsel J. 245 (1969). Currently four distinct views are held by the courts on this issue: (1) the judgment is conclusive upon the surety; (2) it creates a *prima facie* case against the surety; (3) it creates a rebuttable presumption of the principal's liability to the creditor or (4) it is entitled to no weight whatever; 38 Am.Jur.2d *Guaranty* § 77; 59 A.L.R.2d 752 (1958); Simpson, *Handbook on the Law of Suretyship* § 51 (1950); *Restatement of Security* § 139 (1941). The differing viewpoints on this question reflect a policy of conserving judicial resources as well as the parties' time and expense by shaping the current law of *res judicata* into the framework of the tripartite suretyship relation.

*Newman v. Shelby*, (1826) 2 Blackf. 26, rejects the "conclusive" view propounded by the University. *Newman* involved an action of debt on a sheriff's bond instituted after the sheriff failed to return a levy of execution against a judgment debtor. The plaintiff won his suit against the sheriff. Execution was levied but was returned *nulla bona*. The plaintiff then sued the sheriff's surety seeking compensation under the sheriff's bond. The trial court sustained an objection to the introduction in evidence of the prior judgment. When the judgment for the surety was appealed on the issue of the admissibility of the prior judgment, the Supreme Court affirmed the trial court's refusal to admit evidence of such prior judgment stating that as between the principal (sheriff) and the surety, the prior judgment concluded nothing against the other in behalf of the plaintiff. The Court reasoned that the judgment was evidence as "between the same parties, on the same subject, and all persons claiming under them;" but that it did not extend to strangers who lacked the opportunity to examine witnesses, defend against the action or appeal to a higher court. *Id.* at 29.

*Hotchkiss v. Lyon*, (1829) 2 Blackf. 222, broadened the *Newman* holding by stating that "a judgment against a principal is in no case conclusive against a surety, no matter on what grounds that judgment has

been given." While the continued validity of *Hotchkiss*'s broad statement on this issue is open to question, especially in light of the common law distinction between accommodation sureties and compensated sureties, these cases collectively support the conclusion that a prior judgment against a principal is not conclusive against a surety.

The University relies heavily on the case of *Detroit Fidelity & Surety Co. v. Frey*, (1927) 96 Ind.App. 696, 158 N.E. 910, to support its contention that the surety is bound by a prior judgment against its principal. *Detroit Fidelity* involved an action on a contractor's bond, executed to induce a property owner to fully compensate the contractor for unfinished work. A materialman, whom the contractor failed to compensate, had previously sued both the contractor and the owner to foreclose his lien. The contractor notified his surety of the pendency of the action but the surety did not participate in the proceedings. Judgment was entered against both the contractor and the owner. In order to avert a foreclosure sale of his property, the owner satisfied the judgment.

Unable to obtain reimbursement from the contractor, the owner sued both the contractor and his surety. The Appellate Court held the surety was bound by the prior judgment against the contractor finding him liable to the materialman. In so holding the Court emphasized that the surety had received notice of the materialman's foreclosure and *had had its opportunity to defend*. Failing to do so, it was bound by the judgment of foreclosure against the owner's property. In reaching this conclusion the Court failed to cite authority for the conclusion that the surety is bound by the prior judgment. In light of the cases discussed, *supra*, the weight of Indiana authority is directly opposed to this conclusion. No Indiana cases have been found which follow the *Detroit Fidelity* result, nor in fact, has the case ever been cited as authority for such a proposition.

Language in *Detroit Fidelity* suggests the Court may have confused the distinctions between suretyship and indemnity.[6] It is only with respect to indemnity contracts that the cases hold that a prior judgment against the indemnitee on an action on the contract binds the indemnitor if he has had notice of the suit and an opportunity to defend. *Hoosier Casualty Co. v. Miers, supra; Hotchkiss v. Lyon, supra; Snodgrass v. Baize, supra*. Because the guarantor is secondarily liable for the principal's debt or default, the principal continues to bear the liability, either by payment in the first instance or by reimbursement of the guarantor who pays the principal's obligation, in which case the guarantor is subrogated "to all the rights which the creditor had against the principal prior to satisfaction of the debt." *Ertel v. Radio Corp. of America*, (1974) 261 Ind. 573, 577, 307 N.E.2d 471, 474. Accordingly, the *Detroit*

---

**6.** Contracts of suretyship, guaranty, and indemnity serve the same purpose, i. e., protection of the promisee against loss. However, the essential nature of the promises differ. A contract of suretyship normally imposes no duty upon the surety to defend its principal nor does it give the principal any right to represent the surety in any litigation brought by a creditor. *Park v. Ensign*, (1903) 66 Kan. 50, 71 P. 230.

An indemnity contract creates a primary liability in that the indemnitor promises to save the indemnitee harmless to loss as a result of the promisee's assumption of an obligation to a third person. *See gen.* Stearns, *The Law of Suretyship* § 1.6 (Elder rev., 5th ed. 1951); 38 Am.Jur.2d *Guaranty* § 17.

A guaranty contract establishes a secondary liability, i. e., a promise to answer for the debt or default of another. The primary obligation is that of the debtor to the creditor with the promise of guaranty securing the performance of debt obligation. *Id.* Consequently, a contract of guaranty is collateral to some other contract or transaction, while a contract of indemnity is an original contract. In such an indemnity contract there is direct privity between the promisor and the promisee, but between the person to whom the promise of guaranty is given and the person for whom the latter undertakes as guarantor, there is no privity at all. *Hoosier Casualty Co. v. Miers*, (1940) 217 Ind. 400, 27 N.E.2d 342; *Anderson v. Spence*, (1880) 72 Ind. 315; *Snodgrass v. Baize*, (1980) Ind.App., 405 N.E.2d 48 (Petit. to Transf. pending).

*Fidelity* holding as applied to the guaranty relationship is highly questionable.[7]

The views that a finding of the principal's liability creates a rebuttable presumption or establishes a *prima facie* case appear to be logically justified where the principal's liability is actually litigated in the prior proceeding. However, where, as here, the principal's liability is not actually litigated, the rendition of a judgment should be of no effect. This conclusion is based primarily upon the nature of bankruptcy proceedings. While the bankrupt must examine and report to the trustee concerning the correctness of all proofs of claim, 11 U.S.C. § 521(2); Bankruptcy Rule 402; the bankrupt has little, if any, incentive in denying liability or disputing the amount of the claim where, as here, the only claim made greatly exceeded the bankrupt's estate. Furthermore, since Indiana Bonding was not a party to the proceeding and no objection to the claim was filed, Bankruptcy Rule 306 required that it be allowed upon receipt by or upon presentation to the court. In such a situation we are reluctant to give the allowance any effect in a subsequent suit between a creditor and a guarantor. Indeed, the bankruptcy rules themselves give such an allowance a very limited effect.[8]

Our resolution of this *res judicata* issue is supported by *United States v. Hayes*, (9th Cir. 1966) 369 F.2d 671. *Hayes* was an action by the United States as a judgment creditor seeking to recover the unliquidated amount of a note from the guarantors of the note. The note represented a loan made by the Reconstruction Finance Corporation (whose functions subsequently were transferred to the Small Business Administration) to the Hayes and Whiteley Enterprises. This enterprise was a partnership venture by the Gastineau Corporation and the Chicagof Corporation. The note was secured by a first mortgage on real property and the chattels owned by the partnership. The principal officers of the two debtor corporations, together with their wives, executed a written guaranty of the note. The debt was reduced by a few payments but, subsequently, the partnership suffered financial problems and was adjudicated a bankrupt.

The Small Business Administration sued on the note and, although served, the two partner corporations took no action in defense and defaulted. The trustee of the bankrupt partnership entered a general appearance, but effectively consented to the judgment entered on the note. The guarantors of the note were notified of these proceedings. After the proceeds of the foreclosure were applied to the judgment debt of $48,983.72, an unsatisfied balance of $30,691.67 remained. Based on the written guaranty, the United States then filed suit against the guarantors seeking payment of the unsatisfied balance. Rather than offer proof pertaining to the amount of the remaining debt allegedly owed by the guarantors, the United States "invoked a rule that

---

7. Similarly, the University misplaces its reliance on *United States v. Coast Wineries*, (9th Cir. 1942) 131 F.2d 643 because it affirmed a longstanding rule holding that a finding of nonliability against the principal in a bankruptcy proceeding eliminated the creditor's claim preventing a subsequent suit against the surety based on the same cause of action. The *Coast Wineries* holding represents the generally recognized exception to the mutuality of estoppel requirement of *res judicata*. Theoretically, in derivative liability cases a favorable judgment for the party primarily liable eliminates an action by the same plaintiff against the person secondarily liable. A contrary ruling would allow inconsistent results and impair the right of subrogation. Since the plaintiff has "had his day in court" there is no inequity in this rule. *See* Greenebaum, *In Defense of the Doctrine of*

*Mutuality of Estoppel*, 45 Ind.L.J. 1, 4–5. *See also* Restatement of Security § 139(1) (1941).

8. Bankruptcy Rule 306(b) states that "a claim filed in accordance with [the rules] shall be deemed allowed *for the purpose of distribution* unless objection is made by a party in interest." (Emphasis supplied.) The purpose of subdivision (b), as explained in the Advisory Committee's notes, was to relieve the Bankruptcy Court of the burden of making a formal allowance of claim orders to which no objection had been made. The automatic allowance created by this rule was only for the purpose of distribution and it did not constitute a determination as to the amount or validity of the claim for any purpose. *See* 3 *Collier on Bankruptcy* ' 57.14[7.1] (14th Ed., 1977).

a judgment obtained in a suit against a principal debtor is *prima facie* evidence of the liability of his guarantor or surety in a subsequent suit." *Id.* at 675. The District Court concluded that the United States had failed to meet its burden of proof on this issue and entered a judgment of dismissal at the end of the trial.

The issue before the Ninth Circuit was whether the judgment obtained against the principal debtor, Hayes and Whiteley Enterprises, was *prima facie* evidence of the guarantor's liability on the note in the instant case so as to require reversal of the District Court's judgment of dismissal. The Court noted the above-stated general rule relied upon by the United States and advanced by the University in support of its argument on the *res judicata* issue herein. However, the Ninth Circuit applied an exception to the rule which "arises when the creditor's judgment against the principal, in a suit in which the guarantor is not joined, is taken by default or obtained by confession." *Id.* at 675. This exception, as quoted by the Court from comment e to Restatement of Security § 139(3) (1941), is that " '[s]uch a judgment against the principal does not create a rebuttable presumption of the principal's liability, in an action between creditor and surety." *United States v. Hayes*, 369 F.2d at 675. The Ninth Circuit affirmed the judgment of dismissal concluding that where "a creditor has obtained a judgment against the principal in an action which the principal has not contested, that judgment in the creditor's subsequent and first suit against the guarantor, can not and should not, of itself alone, constitute *prima facie* evidence of the amount of the guarantor's obligation. *Id.*[9]

Because the nature of the bankruptcy proceeding prevented actual litigation of the amount of Vendors's liability as well as

did not determine Indiana Bonding's liability on the Indianapolis bond nor the amount of its liability on the bond, the trial court did not err in failing to regard the bankruptcy judgment as *res judicata* on the issue of liability.

C. *Indiana Bonding's Actions Do Not Estop It From Denying the Nature and Extent of Vendors's Liability.*

As an alternative to its *res judicata* argument, the University argues that Indiana Bonding's conduct results in an estoppel to deny the nature and extent of Vendors's liability. Specifically, the University directs our attention to the following actions of Indiana Bonding as creating the estoppel: (1) Indiana Bonding's request that the University file a claim in bankruptcy, (2) Indiana Bonding's failure to contest the University's claim in bankruptcy and (3) Indiana Bonding's "acceptance of the benefits" from the distribution in bankruptcy which reduced the amount of its liability under the Indianapolis bond.

Neither party disputes the fact that Indiana Bonding requested the University to file a claim against Vendors's estate before further discussing the University's claim. The University contends that this request, combined with Indiana Bonding's failure to make any objection to the amount allowed in bankruptcy, creates an estoppel to relitigate the amount of Vendors's liability. Ind. Code 34 1 55-1 permits, but does not require, a surety to cause the creditor to "institute an action upon a contract" against the principal. This statute "abridges the common law right of the creditor to indulge [the] principal debtor by delay," *Fry v. Eisenbiess*, (1914) 56 Ind.App. 123, 125, 104 N.E. 995–96, by providing a mechanism through which the surety may establish a method requiring the creditor to take

---

9. While our research did not unearth any cases holding that a guaranty is not in privity with its principal, we note that normally a surety lacks privity with his principal since the surety's privity with his principal is in the contract and not in the cause of action. *Park v. Ensign*, (1903), *supra; see also Pye v. Dept. of Transp. of State of Georgia*, (5th Cir. 1975) 513 F.2d 290; 1B

MOORE'S FEDERAL PRACTICE, ' 0.412[7] at 1831–32 (2d Ed. 1974). Therefore, we question whether the privity requirement for *res judicata* was satisfied in this case especially since Indiana Bonding did not appear in the bankruptcy proceeding. *See also Hoosier Casualty Co. v. Miers, supra; Snodgrass v. Baize, supra.*

the initiative without the surety first paying the principal's debt and then instituting proceedings for reimbursement. *Daily v. Robinson*, (1882) 86 Ind. 382. This legislation serves to negate the University's claim of estoppel since Indiana Bonding was merely exercising its statutory prerogative by requiring the University to file a claim in bankruptcy.[10]

Similarly, Indiana Bonding's failure to contest the University's claim in bankruptcy lacks any significance. The University contends that an estoppel should arise because Indiana Bonding had standing to object to the allowance of claim but failed to do so. To support its argument the University cites 11 U.S.C. § 502(d) and *Rosenbaum v. Dutton*, (8th Cir. 1913) 203 F. 838.

11 U.S.C. § 502(d) provides that proven claims shall be allowed unless parties in interest object to their allowance. The Bankruptcy Act does not define "parties in interest;" however, the case law indicates that the definition is narrow.[11] "The bankrupt's debtors are certainly not parties in interest so as to object to the allowance of claims if their liability is independent from the bankrupt's insolvency." 3 *Collier on Bankruptcy, supra*, ¶ 57.17[2.5] at 287. Our research has not revealed any case wherein the guarantor of a bankrupt was admitted for purposes of filing an objection to a creditor's claim, the case of *Rosenbaum v. Dutton, supra*, to the contrary notwithstanding.

*Rosenbaum* presented the issue whether stockholders, who were subject to assessment for the corporation's debts to the extent of unpaid stock subscriptions, were "parties in interest" entitled to object to the allowance of a claim by a creditor. The stockholders would have been liable to the extent the claim was allowed. Apparently the stockholders were also creditors of the

bankrupt by reason of having been compelled to pay notes of the bankrupt on which they were the endorsers. The objections, however, were made by those persons in their capacity as stockholders, not as guarantors or sureties.

If the claim was allowed, the stockholders would have had to pay it; on the other hand, if the claim was fraudulent or unjust and disallowed or expunged, the stockholders would have been relieved of paying any assessment made by the bankruptcy referee for the purpose of paying off the claim. In resolving the issue presented, the court held that the "only parties who have any interest in the res of this bankrupt are the appellants [the stockholders] for they are the only persons who can be injuriously affected by the result or determination of this claim of appellee [creditor]." *Id.* at 841. Thus, *Rosenbaum* is distinguishable from the present appeal in two respects. First, the objections to the allowance were made by stockholders who were subject to assessment and not by sureties or guarantors. Second, even if *Rosenbaum* is construed as involving objections by a surety or guarantor, it is apparent that the stockholders, prior to bankruptcy, had paid the bankrupt's creditors and therefore were subrogated to the creditor's rights against the bankrupt. *See Ertel v. Radio Corp. of America, supra*. Consequently, the stockholders became creditors of the bankrupt with the right to participate in the bankruptcy proceedings.

Finally, the University argues that Indiana Bonding by accepting the benefits of the bankruptcy judgment is bound by that judgment. This contention is based on the fact that the bankruptcy dividend received by the University lowered the amount of Indiana Bonding's liability on the bond as found by the trial court. The cases cited by

---

10. The statute appears to be a codification of the rule announced in *Payne [Pain] v. Packard*, (1816) 13 Johns [N.Y.] 174. It is subscribed to by a significant minority of jurisdictions. Nevertheless, the *Payne* doctrine has been criticized because it contradicts "one of the creditor's purposes in insisting upon the surety's undertaking [which] is to avoid the burden and

delay of enforced collection; . . . ." Simpson, *Handbook of the Law of Suretyship*, § 42 at p. 179 (1950).

11. *See gen.*, 3 *Collier on Bankruptcy, supra*, ¶ 57.17[1-2.5] for a discussion of those "parties in interest" who have standing to object to the allowance of a claim.

the University involve an estoppel created by a party's inconsistent positions in successive actions. The case now before us does not present such a situation. As previously noted, Indiana Bonding had no right to participate in the bankruptcy proceedings. Indiana Bonding merely acted in a manner reflective of a desire to limit any liability it may have had by exercising its statutory and common law rights.

For the foregoing reasons there is no basis in the record for binding Indiana Bonding to the bankruptcy judgment on the basis of estoppel and the trial court did not err in this regard.

D. *The Evidence is Sufficient to Support the Trial Court's Conclusion That Indiana Bonding Was Liable to Indiana University on the Indianapolis Bond for $19,022.05.*

The trial court found that the commissions claimed by the University on the Indianapolis contract were "based primarily upon estimates and projections which were not in accord with the reported figures or historical data for prior years' operations." Finding of Fact No. 11, *supra*. The trial court computed the commissions owed the University by using the average of monthly payments actually made by Vendors before default. This average monthly figure was $3,671.32. Based upon five missed payments the trial court computed that the total amount due to be $18,356.60, less the proportional bankruptcy dividend of $4,701.15, leaving a net amount of $13,-655.45. This net amount plus statutory interest of $5,366.60 totaled $19,022.05, the judgment awarded by the trial court as damages.

The University, in attacking the sufficiency of the evidence to sustain the trial court's finding, insists the trial court erred in relying on such historical data in view of the University's presentation of what it represented as substantial, reliable projected figures establishing the commissions due on service to expanded facilities. For the reasons stated below, we conclude that the evidence is sufficient.

The purpose of damages is to award or impose a pecuniary compensation, recompense or satisfaction for an injury done or a wrong sustained by a party. *City of Gary v. Falcone*, (1976) 169 Ind.App. 295, 348 N.E.2d 41; *Hege v. Newsom*, (1930) 97 Ind.App. 465, 170 N.E. 336. The fundamental rule of damages is that the party injured by the breach of contract "is limited in recovery to the loss actually suffered by the breach." *Irving v. Ort*, (1957) 128 Ind. App. 225, 229, 146 N.E.2d 107, 110. Where the breach of contract consists of a failure to pay the debt of another, the measure of damages has usually been considered to be the amount lost in consequence of the breach. *Devol v. McIntosh*, (1864) 23 Ind. 529; *Weddle v. Stone*, (1859) 12 Ind. 625.

To support an award of compensatory damages, facts must exist and be shown by the evidence which afford a legal basis for measuring the plaintiff's loss. The damages must be susceptible of ascertainment in some manner other than by mere speculation, conjecture or surmise and must be referenced to some fairly definite standard, such as market value, established experience, or direct inference from known circumstances. *Wabash Co., Inc. v. Beasley*, (1977) Ind.App., 359 N.E.2d 266; 22 Am. Jur.2d *Damages* § 25 (1965); *Accord, Daly v. Nau*, (1975) 167 Ind.App. 541, 339 N.E.2d 71.

With regard to our standard of review, this Court may not reverse the damage award if it is within the scope of the evidence before the trial court. In determining whether there is sufficient evidence, we may not weigh the evidence nor judge the credibility of the witnesses. *Daly v. Nau, supra; Valcan Corp. v. M. T. Sparks, Inc.*, (1968) 143 Ind.App. 543, 241 N.E.2d 862. If the award of damages is supported by the record, the determination of damages is within the sound discretion of the trial court. It is our opinion in this case that the trial court did not abuse this discretion.

At trial the University sought damages, after it had applied the proportional divi-

dend share received in the bankruptcy proceeding, on the Indianapolis bond totaling $22,240.65. The bases for the amount sought were the commissions due from a five month period for which the University had not received payment. This five month period represented a time when Vendors allegedly expanded its service to more buildings on the campus. Thus the University insisted that its projected figures for commissions should have been utilized by the court instead of figures for previous periods when Vendors supplied fewer machines in fewer buildings.

Alvin York, the University's associate counsel, testified that he relied on other individuals within the University community in developing these figures and had no idea as to how the projections were developed. Arthur Lautzenheiser, who was in charge of the Indianapolis contract, testified that he too relied on another person within the Indianapolis campus to determine the past due commissions and stated he did not know how the projections were developed. Furthermore, he noted there were two periods, December 5, 1970 and January 2, 1971, when the projected sales figures might have been based on actual sales figures; however, he was unable to testify that such was the case. In describing why the projected sales commissions were higher than in previous years he testified that Vendors had initially serviced only the Medical Center complex, but beginning in December, 1970 three other buildings were added to the campus on the west side. While this provided an explanation for the increased commissions sought, it did not explain the University's mechanism for determining these projections. We can not fault the trial court for rejecting the University's projected figures when at trial it failed to present a witness who could establish the method for preparing and the degree of accuracy of its projected figures.

Judgment affirmed.

YOUNG, P. J., and CHIPMAN, J., concur.