LESLIE FAY, INC., Carlye Dress Corporation, Carlye Junior Sportswear, Inc. and Carlye Manufacturing Corporation, Plaintiffs,

v.

Melvin RICH and Arthur Feinberg, Defendants.

No. 79 Civ. 418.

United States District Court, S. D. New York.

Oct. 18, 1979.

Parker, Chapin, Flattau & Klimpl, New York City, for plaintiffs by Mark Abramowitz, Menachem J. Kastner, New York City.

Newman, Tannenbaum, Helpern & Hirschtritt, New York City, for defendants by Stuart B. Newman, New York City.

## OPINION

SOFAER, District Judge:

Plaintiffs in this diversity action sued defendants as guarantors of an assignment and fixture lease. The amended complaint alleges two claims. The first seeks $14,-954.46 as the unpaid rent on a real property lease. The second seeks $19,768.41 as the unpaid rent on a fixture lease. Defendants do not dispute plaintiffs' allegations of nonpayment, but contest their liability on various grounds. Plaintiffs have moved for summary judgment. The motion is granted to the extent specified in this opinion, and the case is hereby referred to a magistrate to prepare a report and recommendation as to damages.

The facts are largely undisputed, although defendants ritualistically disclaim knowledge of many of them. In April 1968, plaintiff Carlye Dress Corp. ("Carlye"), a subsidiary of plaintiff Leslie Fay, Inc., entered into a five-year lease with Durymo Corp. as lessor for certain commercial property located at 1520 Washington Avenue, St. Louis, Missouri. The lease was extended for an additional five years, to run from December 1, 1973 to November 30, 1978, at a monthly rental of $2,775.00. Carlye and other subsidiaries of plaintiff Leslie Fay operated an apparel manufacturing business on the premises. By 1975 that business was losing money. Defendant Melvin Rich was at the time president of Leslie Fay's subsidiaries.

Some time prior to May 1975, Leslie Fay and Melvin Rich began negotiating for the

purchase by Rich and the defendant Arthur Feinberg of Carlye and the other Leslie Fay subsidiaries. Rich and Feinberg formed A & 'M Manufacturers, Inc. ("A & M"), a Missouri corporation, to act as their purchasing entity. On May 19, 1975, Carlye Dress, acting as "Seller", entered into a "Purchase, Assignment and Assumption Agreement" with A & M as "Buyer." In general, the agreement was designed to enable Rich and Feinberg, through A & M, to take over ownership and control of Carlye and the other subsidiaries for a minimal, up-front cash payment, while enabling Leslie Fay to avoid further losses from its Carlye operations. Its provisions included:

1. the sale by Carlye and its subsidiaries to A & M of most of Carlye's existing assets, including the Carlye trademark (Pltfs' Exh. E, ¶¶ 1 & 4);

2. a promise by Carlye that it would lease to A & M all its furniture and fixtures at 1520 Washington Ave., St. Louis, and at 530 Seventh Avenue, New York City, for three years at an aggregate amount of $77,000, on certain terms described below (Pltfs' Exh. E, ¶ 2); and

3. an assignment by Carlye to A & M of its interest in certain leaseholds, including the premises at 1520 Washington Ave., St. Louis, and an assumption by A & M of all Carlye's obligations under the leases (Pltfs' Exh. E, ¶ 3).[1]

The Buyer, A & M, and the Guarantors, Rich and Feinberg, warranted that the "Agreement and any other instruments delivered to Seller under this Agreement constitute legal, valid and binding obligations of Buyer and Guarantor enforceable in accordance with their respective terms." (Pltfs' Exh. E, ¶ 5(c)). Furthermore, the parties provided that the agreement represented their "entire" understanding,[2] and that any modification of its terms could be effected "only by written instrument. . . ."[3] Finally, in a "Guaranty" appended to the agreement, Leslie Fay agreed, as "an inducement to Buyer and Guarantors to enter into" the arrangement, "to indemnify and hold Buyer and Guarantors harmless from any and all liabilities and claims that they may incur from creditors of Seller and the Subsidiaries for obligations incurred by Seller and the Subsidiaries, other than those being assumed pursuant to the terms of the foregoing Agreement" (Pltfs' Exh. E, p. 10).

Simultaneously with the May 19, 1975 agreement, Carlye fulfilled its promise to lease its furniture and fixtures to A & M. In general, the terms of the three-year fixture lease, summarized in the overall agreement, were that A & M would pay $77,000 in six semi-annual installments of $12,833.33 each; that lessor (Carlye) made no warranties other than full ownership; that lessee (A & M) agreed to pay all taxes, fees and expenses relating to the leased property, including repairs, and would assume all

---

1. In a separate Assignment and Assumption Agreement, dated May 19, 1975, Carlye assigned its lease with Durymo to A & M for $1.00. The assignee assumed all the leasehold obligations, including rent. The assignee also agreed the lease could not be further assigned or sublet without the assignor's written consent, and Feinberg and Rich guaranteed the assignee's performance.

2. The agreement stated:
   This Agreement sets forth the entire agreement and understanding of the parties with respect to the transactions contemplated hereby and supersedes any and all prior agreements and understandings relating to the subject matter hereof. No representation, promise, inducement or statement of intention has been made by any party hereto

which is not embodied in this Agreement or other document delivered pursuant hereto or in connection with the transactions contemplated hereby, and the party shall be bound by or liable for any alleged representation, promise, inducement, or statement of intention not set forth herein or thereunder.
(Pltfs' Exh. E, ¶ 11).

3. The agreement stated:
   This Agreement may be amended, modified, superseded or cancelled, and may [sic] of the terms, covenants, representations or warranties or conditions hereof may be waived, only by written instrument executed by the parties hereto or, in the case of a waiver, by the party waiving compliance.
(Pltfs' Exh. E, ¶ 12).

risk of loss; and that lessee had the option to take title to the leased property, after all six installments were paid, for an additional payment of $1 (Pltfs' Exh. F). The lease could be terminated unilaterally by lessee "as of the due date of any rental installment by giving to Lessors written notice of its intention to so terminate not later than 30 days prior to such due date." (Pltfs' Exh. F, ¶ 15). Finally, defendants personally guaranteed the payments due,[4] and the parties agreed that any modification of the lease would be ineffective unless in writing and signed.[5]

Defendants operated the Carlye apparel business for about two years, during which they changed the name A & M Manufacturing to Camco Manufacturers, Inc. ("Camco"). They failed to turn the business around. On June 16, 1977, Camco assigned its assets by deed of trust for the benefit of its creditors. The trustee, Lawrence Sanders, Esq., remained in possession of Camco's properties until September 6, 1977, when an involuntary petition in bankruptcy was filed against Camco. On December 2, 1977, Camco was adjudicated a bankrupt in the United States District Court for the Eastern District of Missouri.[6] Payments made by the trustee and by substitute tenants after bankruptcy failed to cover the rent due Durymo on the lease assigned to A & M and later assumed by Camco. Leslie Fay was therefore required to pay a total of $20,104.02 to Durymo on the lease, of which it recovered only $5,149.56 from the bankruptcy court, leaving its claim against the guarantors of $14,954.46. Furthermore, only three of the six projected payments under the fixture lease were made by Camco, leaving a debt to Carlye (and Leslie Fay) of $36,522.81. Had plaintiffs recorded their

security interest in the leased fixtures, much, if not all, of this debt would have been recovered from the bankruptcy court. As unsecured creditors, however, Leslie Fay was awarded only $16,750.40, resulting in its claim against the guarantors of $19,768.41, plus its related costs and expenses, including a reasonable attorney's fee.

## I.  The Claim for Rental Payments

■ Defendants claim they owe nothing as guarantors of the rent due to Durymo because the agreement included a "Guaranty" by Leslie Fay that defendants would be held harmless. They assert that plaintiffs' claim for relief "is in direct conflict on its face with the language of the indemnity by Leslie Fay. . . ." The defendant Rich asserts in his affidavit that the purpose of the indemnity was to limit the risk of A & M and the guarantors to the cash payments A & M made to Leslie Fay, and to provide a "safety valve" whereby they could limit their losses at their option if the business could not be resuscitated. Defendants argue that these allegations of Rich raise a genuine issue of material fact requiring discovery on the meaning and intent of the "cross-guarantees."

Defendants' arguments concerning Leslie Fay's guaranty are frivolous. The guaranty by its terms applies only to "liabilities or claims that they [defendants] may incur from creditors of Seller and the Subsidiaries for obligations incurred by Seller and the Subsidiaries. . . ." (Pltfs' Exh. E, p. 10). This language, even taken alone, strongly suggests that Leslie Fay was assuring defendants that they would not be held accountable for obligations of Carlye and the subsidiaries that were unknown to

---

**4.**  The lease provided:

  Arthur Feinberg and Mel Rich, by their execution of this lease, personally guarantee, jointly and severally, all of the liabilities and obligations of lessee under this lease, including without limitation the obligation to pay all rental installments due under this lease. (Pltfs' Exh. F, ¶ 17).

**5.**  The lease provided:

  This lease may not be changed or terminated orally and a waiver or modification of any

provision hereof or of any right or remedy by either party shall not be effective unless in writing and signed by the party against whom such modification or waiver is asserted.
(Pltfs' Exh. F, ¶ 18).

**6.**  *In the Matter of Camco Industries, Inc., d/b/a Carlye Dress Co., f/k/a A & M Manufacturers, Inc.,* Bankruptcy No. 77–01170.

defendants, or that might thereafter somehow be incurred. Any doubt about the meaning of this language is authoritatively resolved by the guaranty's express exclusion from its coverage of any claim or obligation of Seller "being assumed pursuant to the terms of the foregoing Agreement." (Pltfs' Exh. E, p. 10). The Seller's obligation to pay rent to Durymo was uncontestably assumed by A & M in paragraph 3(a) of "the foregoing Agreement," and defendants are therefore liable as guarantors of that obligation. Defendants' argument that Leslie Fay's guaranty saves them from liability on the fixture lease fails for the same reasons. Although defendants correctly argue that the guaranty should be deemed applicable to the fixture lease,[7] the "foregoing" Agreement clearly imposes upon A & M, and therefore upon guarantors, the obligation to pay $77,000 for the fixtures, in six semi-annual installments.

■ Defendants properly point out that disputes over the interpretation of contractual language may sometimes make a claim inappropriate for summary judgment disposition. But the cases they cite proscribe summary judgment only where the "contractual language is susceptible of at least two fairly reasonable interpretations," and therefore "presents a triable issue of fact." *Heyman v. Commerce and Industry Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975). Unlike the present case, *Heyman* involved ambiguous contractual language.[8] This case, by contrast, requires application of the basic contract rule that, where the language of a guaranty is unambiguous, no need exists to resort to other means of interpretation, and effect must be given to the parties' intent as indicated by the language itself. *E. g., Western Union Tel. Co. v. American Communications Assoc.*, 299 N.Y. 177, 86 N.E.2d 162 (1949). The meaning to be given such an instrument is an issue of law, for the court's determination. *Salzman v. Bowyer Productions, Inc.*, 42 A.D.2d 531, 344 N.Y.S.2d 755 (1st Dept. 1973).

■ Defendants seek to avoid these basic rules by claiming that the parties' true intent in the Leslie Fay guaranty was to assure defendants they could cut their losses at any time by simply shifting the obligation to pay rent back to the Seller. Arguments based on intent are understandably fashionable in opposition to summary judgment motions, given the principle that genuine issues of intent must usually be resolved after trial. *Friedman v. Meyers*, 482 F.2d 435, 439 (2d Cir. 1973). But this principle is inapposite where, as here, "the intention of the parties may be gathered from the four corners of the instrument"; in such situations, "interpretation of the contract is a question of law, and parol evidence is not admissible as an aid in interpretation; [and] no trial is necessary to

7. The agreement, and the accompanying fixture lease and lease assignment, are not only all part of one transaction, the agreement actually includes a promise to lease the fixtures. Leslie Fay's guaranty should therefore be read to apply, for example, to any obligation Seller incurred concerning the fixtures that was not assumed by A & M in the agreement, such as debt or mechanic's lien. The obligation to pay Seller for the fixtures is not an obligation incurred by Seller, and is expressly assumed by A & M.

8. The disputed language in *Heyman* was clearly susceptible of two reasonable interpretations. That case involved a settlement agreement on an insurance claim. Pursuant to that agreement, the insured was obligated to "replace" a building destroyed by fire. The defendant insurer agreed to pay a sum to plaintiff at the stage of construction at which the "new building" was watertight. Plaintiff built a building significantly different from the original structure. Defendant claimed that by the words "replace" and "new building", the parties intended the construction of a building similar to the destroyed one. Plaintiff contended that a similar building was not required. From the face of the document, the intent was ambiguous. Moreover, there was also a question of whether the original policy had been merged into the settlement agreement and whether the language in that policy concerning replacement of property was relevant to the interpretation of the settlement agreement. No such circumstances exist here. Similarly, in *Home Insurance Co. v. Aetna Casualty and Surety Company*, 528 F.2d 1388 (2d Cir. 1976), also cited by defendants, the clause in dispute was on its face ambiguous. The other cases cited by defendant, do not involve summary judgment in the context of interpretation of contract.

determine the legal effect of the contract." *General Phoenix Corp. v. Cabot*, 300 N.Y. 87, 92, 89 N.E.2d 238, 241 (1950).

Furthermore, a claim based on the parties' intent or understanding is particularly meritless where it amounts to an effort to vary written terms despite the presence of provisions expressly precluding any modification other than in writing. See n. 3, *supra*. The overall purchase agreement specifically anticipates and precludes an argument based on unexpressed intention. See n. 2 *supra*. The fixture lease contains a similar provision in its paragraph 15, and in any case, as defendants contend, the fixture and real property leases are part of the overall agreement, and are therefore controlled by its limitations. As the Court of Appeals said in *Fogelson v. Rackfay Construction Co.*, 300 N.Y. 334, 340, 90 N.E.2d 881, 884 (1950): "In truth, if the lease before us—complete on its face and drafted designedly and explicitly to prevent reliance upon any promise or agreement not included—could be varied and undermined by parol evidence, few written instruments would be safe or secure." *See also* N.Y.G.O.L. § 15–301.

Defendants alternatively argue that summary judgment should be denied because defendants *may* have given plaintiffs written notice of termination of the leases. See Pltfs' Exh. E, ¶ 2; Pltfs' Exh. F, ¶ 15. (Defendants' claim of actual, but not written, notice is denied, and is in any event legally insufficient.)[9] Significantly, defendants do not claim they gave written notice, only that they may have done so. Over seven months have passed since the complaint was filed in this case, more than enough time for defendants to find any written notice they may have sent. The letters sent by plaintiff to defendants, reminding them of their liability, to which defendants did not even respond, belie the possibility that written notice was in fact sent.[10] In this context, defendants cannot be permitted to manufacture an issue of fact by asserting they may have done something that would have limited their liability. It is difficult enough to cope with the many baseless allegations parties make to avoid summary judgment. Justice could almost always be delayed, if not perverted, if parties are to be allowed to avoid summary judgment by alleging possibilities instead of facts.

The only other defense urged against the property-lease claim is that plaintiffs failed to satisfy their duty to mitigate damages. Plaintiffs note that defendants initially failed to allege they were assignees rather than subtenants, and that as subtenants of commercial property they would have no claim based on any duty to mitigate. "[T]he usual obligation in the law of contracts to reduce damages has no application to a contract of leasing, and a landlord is under no obligation or duty to his tenant to relet, or attempt to relet, abandoned premises in order to minimize his damages." 2 Rasch, *New York Landlord and Tenant* § 875, p. 324 (2d ed. 1971).

The difficulty plaintiff has here, however, is that defendants changed their theory, and describe "A & M" in their reply brief as an assignee rather than a subtenant. Liberal pleading rules would allow defendants to amend their answer accordingly. *See* F.R.C.P. 15(a). Despite the vigor of plaintiffs' reaction to defendants' change of theory, and despite the fact that defendants

---

9. The actual notice allegedly given by defendants was by a telephone call "two or three days after the assignment" for the benefit of creditors, on June 16, 1977. Defendants obviously hoped until the very end to make the business succeed. By the time they gave notice, it was, by any recognized commercial standard, too late for plaintiff to obtain the benefits that a notice requirement is intended to provide, especially one that mandates 30-day written notice of an intention to terminate. The notice was insufficient even if oral notice could have been adequate, since it was given after the business' termination had become likely if not inevitable.

10. Plaintiffs sent defendants letters at various intervals between September 6, 1977 until October 26, 1978, reminding defendants of their guarantees and bringing up to date the amount owed plaintiffs under the guarantees. (Pltfs' Exhs. K and L). Defendants made no response to these letters at the time, and do not now address their existence.

expressly assumed the obligations of plaintiffs to the landlord Durymo (Pltfs' Exh. G, p. 2), the documents unmistakably make A & M an assignee, not a subtenant. Thus the underlying purchase agreement states that "Seller hereby assigns its interest" in the real property lease. (Pltfs' Exh. E, ¶ 3). Even more significantly, the document transferring Carlye's interest in the lease is called an "Assignment and Assumption Agreement," and repeatedly and explicitly refers to A & M as an "assignee," so normal contract rules regarding damages should apply.

■ The Durymo rental was $2,775.00 per month. Defendants rely on this fact, and the rental obtained by Durymo from a new tenant commencing in November 1978, as proof that plaintiff obtained a rent grossly under market value when it leased the property for $1500.00 per month after A & M had defaulted. Plaintiffs, on the other hand, note that the trustee found the fair rental for the premises was $1500.00, and argue that defendants have failed to meet their burden of proof on the issue. These arguments clearly reflect a disputed issue that requires further argument and proof. Whether and to what extent plaintiff satisfied its obligation to mitigate damages are matters that seem peculiarly appropriate to send to a magistrate for recommended findings and conclusions.

## II. *The Fixture Lease Claim*

■ In addition to the general defenses to the real property lease rejected above, defendants argue that they should be discharged, *pro tanto*, as guarantors of the fixture lease since plaintiffs failed to perfect their lien on the fixtures by filing a financing statement. *See* U.C.C. § 9–302. There is authority in New York rejecting defendants' view on the ground that a cred-

itor need not take affirmative action to protect or preserve any collateral or security he has received from the principal debtor; a surety will be discharged only where a creditor has taken positive steps to interfere with or destroy the collateral. *Westchester Mortgage Co. v. Thomas B. McIntire, Inc.*, 174 App.Div. 525, 161 N.Y.S. 384 (2d Dept. 1916); *New York National Exchange Bank v. Jones*, 9 Daly 248 (Ct. of Common Pleas 1880). *See Board of Supervisors v. Otis*, 62 N.Y. 88 (1875) (passive negligence of creditor does not discharge surety); *McKecknie v. Ward*, 58 N.Y. 541 (1874).[11] Nevertheless, some cases have expressed the opposing view. *Shutts v. Finger*, 100 N.Y. 539, 3 N.E. 588 (1885); *Executive Bank of Fort Lauderdale, Fla. v. Tighe*, 66 A.D.2d 70, 411 N.Y.S.2d 939 (2d Dept. 1978); *Auto Brokerage Co., Inc. v. Morris & Smith Auto Co., Inc.*, 106 Misc. 147, 174 N.Y.S. 188 (1st Dept. 1919). The law in New York appears unsettled. *See also, Lafayette Bank and Trust Co. of Suffern v. Silver*, 58 Misc.2d 891, 296 N.Y.S.2d 926 (Sup.Ct. Rockland Co. 1969); 57 N.Y.Jur. § 201.

In pressing their argument, defendants rely primarily on *Executive Bank of Fort Lauderdale, Fla. v. Tighe, supra.* In *Tighe* plaintiff made a business loan for which it obtained two promissory notes. The loan was also secured by collateral. Defendants signed the promissory notes as accommodation makers. The creditor filed a financing statement with the County Clerk, but it was defective, forcing the holder of the note to take a lesser sum in the subsequent bankruptcy proceedings than the amount to which it would have been entitled as secured creditor. The Appellate Division, Second Department, after noting the uncertainty of New York common law, concluded that U.C.C. § 3–606 required the rule "that the creditor's failure to file a lien resulting

11. Plaintiffs rely on the relatively recent case of *Walter E. Heller & Co. v. Cox*, 343 F.Supp. 519 (S.D.N.Y.1972), aff'd, 486 F.2d 1398 (2d Cir. 1973), as dispositive on this issue. While the language of that decision strongly supports plaintiffs' position, the facts are materially distinguishable. In that case the guaranty stated that plaintiff

shall not be required . . . to enforce or resort to any security, liens, collateral or other rights or remedies thereto appertaining, before calling on [defendant] for payment; nor shall [defendant's] liability in any way be released or affected by reason of any failure or delay on [plaintiff's] part so to do. *Id.,* at 526.

in a loss of collateral *pro tanto* discharges the surety, unless excused by clear and unequivocal language in the agreement between the parties. . . ." 411 N.Y.S.2d at 944.[12] The court, in reaching that conclusion, reasoned that a creditor's failure to file a lien impairs the surety's right of subrogation, and therefore entitles the surety to the *pro tanto* discharge.

Arguably, *Tighe* is distinguishable from the case at bar since it involved a negotiable instrument and was therefore governed by Article 3 of the U.C.C.[13]

As a general matter, however, the rule of *Tighe* may represent the better view even in many commercial dealings outside the context of commercial paper. A guarantor may assume great risks, but he should be entitled to expect creditors to behave with at least a minimal degree of commercial reasonableness and care. In particular, where an independent third party guarantees an obligation as an accommodation to the debtor, it seems reasonable for that party to rely on the expectation that a businessman-creditor will act responsibly and make at least a reasonable effort to secure its collateral under the U.C.C., thereby protecting the guarantor's subrogation interest. The Code's approach properly recognizes the importance of avoiding waste and minimizing damages.

This case, though, presents a situation entirely different from that in which an independent third party guarantees a debt. Several courts, including a New York court, have recognized that where the guarantor controls the debtor it will not be discharged, absent an express agreement to the contrary, by the failure of the creditor to perfect its lien in the collateral. *E. g., Joe Heaston Tractor & Import Co. v. Securities Acceptance Corp.*, 243 F.2d 196 (10th Cir. 1957); *Fireman's Fund Insurance Co. v. Jo-*

*seph J. Biafore, Inc.*, 385 F.Supp. 616 (E.D. Pa.1974), *aff'd*, 526 F.2d 170 (3d Cir. 1975); *Nation Wide, Inc. v. Scullin*, 256 F.Supp. 929 (D.N.J.1966), *aff'd*, 377 F.2d 554 (3d Cir. 1967); *Mikanis Trading Corp. v. Lowenthal*, 94 Misc.2d 962, 406 N.Y.S.2d 220 (Sup.Ct.N. Y.Co.1977).

This rule is sound. In such a situation, the guarantor as a principal party to the negotiations resulting in the ultimate transaction is in a strong position to include in the agreement specific conditions upon which the guaranty is based. In this case the guaranty was unconditional despite the fact that the parties outlined, in great detail, conditions concerning the collateral. Furthermore, the lessor's rights in the event of the lessee's default were clearly negotiated, and set forth, in terms that imposed the costs of any default or termination of the business on the lessee, including expenses and attorneys' fees. (Pltfs' Exh. F, ¶ 12). In this context, the unconditional guaranty must be read at face value. As the court stated in *Nation Wide v. Scullin, supra*, 256 F.Supp. at 932:

> These defendants were not cast in the familiar role of accommodation endorsers, or sureties, a status which would entail less stringent responsibilities in the eyes of the law. Rather they were businessmen—the principal actors, both as individuals and in their corporate *alter ego* —who undertook to perform this arrangement. It is reasonable to assume, nothing contrawise in the record, that they were possessed of some measure of business acumen, when they undertook to guarantee their company's contract performance.

> The paramount obligation here is the guaranty contract of defendants, the consideration for which was the contract of the corporation. . . . Their obligation was unconditional.

---

**12.** U.C.C. § 3–606 provides:

(1) The holder discharges any party to the instrument to the extent that without such party's consent the holder

. . . . .

(b) unjustifiably impairs any collateral for the instrument given by or on behalf of the party . . . .

**13.** *Tighe*'s interpretation of § 3–606 has found support in other courts as well. *See, e. g., First Bank & Trust Co. v. Post*, 10 Ill.App.3d 127, 293 N.E.2d 907 (1973); *White v. Household Finance Corp.*, 158 Ind.App. 394, 302 N.E.2d 828 (1973).

Moreover, on the facts of this case, it would be unjust to excuse defendants from their full obligation. As principals of Camco, defendants were responsible for the decision to make the assignment for the benefit of creditors, thereby precipitating the bankruptcy which cut off plaintiffs' rights as a secured creditor. Defendants should not be allowed to evade their personal obligations by virtue of corporate acts that were fully within their control, see id. at 934, especially when the agreement would have allowed them to avoid liability on the fixture lease by giving plaintiffs 30 days written notice, which might in turn have enabled plaintiffs to act to protect their interests.

Judgment pursuant to F.R.C.P. 56 is therefore to be entered in plaintiffs' behalf in the full amount claimed on both the real property and fixture leases, less such amount as may be found to have been lost due to plaintiffs' failure to minimize damages on the real property. The case is referred to a magistrate for the required findings and recommendations.

SO ORDERED.