**PHARMACEUTICAL SOCIETY OF THE STATE OF NEW YORK, INC., Still's Pharmacy, Inc., Riis–Wald Pharmacy, Inc., and M.F.K. Drug Co., Inc., Plaintiffs–Appellees,**

v.

**Mario CUOMO, Governor of the State of New York, and Cesar A. Perales, Commissioner, New York State Department of Social Services, Defendants–Appellants.**

No. 1136, Docket 88–7179.

United States Court of Appeals, Second Circuit.

Argued April 7, 1988.

Decided Sept. 2, 1988.

Paul M. Collins, Albany, N.Y. (Eileen M. Kelley, Beverly Cohen, Hinman, Straub, Pigors & Manning, Albany, N.Y., of counsel), for plaintiffs-appellees.

Judith A. Gordon, Asst. N.Y. Atty. Gen., New York City (Robert Abrams, Atty. Gen. of the State of N.Y., New York City, of counsel), for defendants-appellants.

Before OAKES and MINER, Circuit Judges, and POLLACK,* District Judge.

MINER, Circuit Judge:

Plaintiffs-appellees Pharmaceutical Society of the State of New York ("the Society"), *et al.*, moved, pursuant to Fed.R.Civ. P. 70, for a temporary restraining order in the United States District Court for the Southern District of New York (Duffy, J.). The purpose of the motion was to compel defendants-appellants Mario Cuomo, as Governor of New York State, and Cesar A. Perales, as Commissioner of the New York State Department of Social Services, to spe-

cifically perform the Stipulation of Settlement and Order ("Settlement Order" or "Order") that had been entered in plaintiffs' 1976 action against the state concerning the method of calculating prescription drug prices for Medicaid reimbursement; to enjoin them from either violating the terms of the Settlement Order or enforcing the amended regulation governing drug price calculation, N.Y.Comp.Codes R. & Regs. tit. 18 § 505.3(h)(2)(v) (1988); and to hold defendants in contempt of court for their alleged violations of the Order.

After a hearing, Judge Duffy issued an order restraining defendants from violating the Settlement Order or enforcing the amended regulation until further order of the court. Defendants appeal from the district court's order. We affirm.

## BACKGROUND

Under the Medicaid Program of the Social Security Act, 42 U.S.C. § 1396 *et seq.* (1982 & Supp. IV 1986), the federal government pays a share of the reimbursable costs of necessary medical care and services provided to individuals qualified to receive Medicaid assistance. This share, known as federal financial participation ("FFP"), is available only to states whose Medicaid plans have been approved by the United States Department of Health and Human Services ("HHS") as meeting the federal requirements. *See id.* § 1396a(a), (b); N.Y.Soc.Serv.Law § 363–a (McKinney 1983). A participating state's plan may include expenditures for prescription drugs among reimbursable costs. *See* 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a)(12).

New York State's plan, administered through the Department of Social Services ("the Department" or "Social Services"), includes prescription drugs among reimbursable costs. *See* N.Y.Soc.Serv.Law § 365–a(2)(g) (McKinney 1983 & Supp. 1988). In 1976, HHS adopted regulations that placed upper limits on Medicaid reimbursement for prescription drugs. The state agency was not allowed to "pay more

* Hon. Milton Pollack, Senior District Judge, United States District Court for the Southern District of New York, sitting by designation.

for prescribed drugs than the lower of ingredient cost plus a reasonable dispensing fee or the provider's usual and customary charge to the general public." 42 C.F.R. § 447.331(a) (1986). The costs of drugs were determined according to acceptable procedures, or "methodologies," outlined in the regulations. For drugs sold by two or more manufacturers or by the same manufacturer under two or more labels ("multiple source drugs" or "MSDs"), one of two federal methodologies for calculating drug prices was mandated unless another methodology employed by a state yielded a lower price. "Estimated Acquisition Cost" ("EAC") required the state to make its "best estimate" of the price that providers "generally" paid for the drug in "the package size providers buy most frequently," *id.* § 447.332(c)(2), (3). "Maximum Allowable Cost" ("MAC") was the cost of the drug as established by the Pharmaceutical Reimbursement Board of HHS' Health Care Financing Administration ("HCFA") and published in the Federal Register, *see id.* § 447.332(a)(1), but could be overridden by a physician's certification that a particular brand of drug was medically necessary, *id.* § 447.332(b). FFP only was "available in expenditures for payments" to pharmacy providers "for services that d[id] not exceed the upper limits," *id.* § 447.304(c).

New York adopted N.Y.Comp.Codes R. & Regs. tit. 18 § 505.3(h)(2)(v) (1987)[1] to implement HHS' regulations in the state: Maximum Medicaid reimbursement for prescription drugs was based on (1) "the usual and customary price charged to the general public"; (2) MAC; or (3) the EAC "which shall be the price shown on the State EAC list established by the Commissioner of Social Services, plus applicable dispensing

fee." The physician override provision of 42 C.F.R. § 447.332(b) was not adopted.

In November 1976, the Society commenced an action against the state in the Southern District of New York, seeking declaratory and injunctive relief relating to the state's administration of the new regulation. The complaint alleged, *inter alia,* that (1) the initial State EAC list, which was a republication of a federal list, was not the "best estimate" of prices which New York pharmacy providers paid for drugs; (2) the price list was established in violation of the State Administrative Procedure Act and due process; and (3) the dispensing fees under N.Y.Comp.Codes R. & Regs. tit. 18 § 528.2 were confiscatory and violated federal requirements. The action was adjourned after a week and a half of testimony when plaintiffs and the Commissioner of Social Services entered into the Settlement Order.

In the Settlement Order, the state agreed to make updated EAC lists available to enrolled pharmaceutical providers and to determine EAC "by surveying and averaging the prices charged" by wholesalers of drugs in New York. The two key provisions of the Order at issue in this case are ¶¶ 6 and 10. Under ¶ 6, Social Services must establish a Pharmacy Advisory Committee ("PAC" or "the Committee")

consisting of from nine (9) to fifteen (15) members, a majority of whom shall be pharmacists participating in the Medicaid program in the State of New York. The Department shall meet with this Committee from time to time but not less than quarterly, for purposes of seeking its advice in matters relating to the pharmaceutical industry, including but not limited to all matters encompassed in this stipulation.

---

1. The regulation provided:
    (v) Charges for prescription drugs. (a) Maximum State reimbursement for a prescription drug shall be based on the lowest of:
    (1) the usual and customary price charged to the general public;
    (2) the maximum allowable cost (MAC) established by the DHEW Pharmaceutical Reimbursement Board for selected multiple source drugs and published in the *Federal Register,* plus applicable dispensing fee; or

    (3) the estimated acquisition cost (EAC) which shall be the price shown on the State EAC list established by the Commissioner of Social Services, plus applicable dispensing fee.
    (b) Reimbursement for prescription drugs shall be limited to those products listed in 10 NYCRR [§] 85.25.
N.Y.Comp.Codes R. & Regs. tit. 18 § 505.3(h)(2)(v) (1987).

Joint Appendix at 28–29 (¶ 6). The Order enumerates two particular situations in which Social Services must deal directly with the PAC: "Specifically, the [PAC] shall be consulted by the Department in regard to the procedures set out in paragraph '5' [providing that the EAC for drugs purchased by pharmacists directly from manufacturers will be the price they 'commonly and currently' pay] and notified not less than thirty (30) days prior to the proposed effective date of any proposed changes in pricing or pricing methodology," *id.* at 29. Proposal of such changes obligates the state to follow a detailed set of procedures:

> The Department agrees to present for the Committee's consideration the basis for any such changes. The Committee upon presentation of such information shall have twenty-one (21) days within which to consider the appropriateness of such change[s] and to present its views to the Department[,] and the Department shall consider and respond to those views within nine (9) days.

*Id.* Under ¶ 10 of the Order, however, the state, "[n]otwithstanding any term or condition of this stipulation, ... expressly reserves the right to use such methodology for determining reimbursement as may be hereinafter mandated by [f]ederal law or [r]egulation or by [s]tate law," *id.* at 30 (¶ 10).

Vincent J. Moreno was elected Chairman of the PAC in 1978, and called regular meetings between September 1978 and May 15, 1986. No meeting was called thereafter. On March 30, 1987, the Pharmaceutical Society's president wrote to Social Services, urging that it reconstitute the PAC as soon as possible because (1) then-Chairman Moreno did not intend to call a meeting "in the foreseeable future," *id.* at

97, and (2) there were important issues "which a functioning advisory committee should be examining at this time," *id.* On July 20, 1987, the Department dissolved the PAC and three weeks later solicited nominations for a reconstituted PAC. The Society submitted six names on September 30 and an additional name on November 19.

On July 31, 1987, HHS regulations were amended, effective October 29, 1987, to make FFP for most MSDs subject to an aggregate upper limit ("AUL"). AUL is "[t]he maximum amount of [s]tate drug expenditures that would qualify for FFP," not to exceed "the upper limit for payments for certain drugs" in the HCFA's published listings. 52 Fed.Reg. 28,648, 28,-649 (1987); *see* 42 C.F.R. § 447.304(a), (c) (1987). On November 18, 1987, Social Services published notice of proposed amendments to N.Y.Comp.Codes R. & Regs. tit. 18 § 505.3(h)(2)(v).[2] These amendments were designed "[t]o conform" New York's prescription drug reimbursement regulation "to new [f]ederal regulations" by adding that "[m]aximum [s]tate reimbursement" for an MSD "must not exceed the aggregate of the specified upper limit set by" the HCFA, "plus a dispensing fee." N.Y.St.Reg. 38–39 (November 18, 1987). Federal physician override provisions, however, again were expressly rejected. *Id.* at 39. These amendments were adopted on January 28, 1988, to become effective March 1. N.Y.St.Reg. 39 (Feb. 17, 1988).

By order to show cause dated February 24, 1988, the Society moved, pursuant to Fed.R.Civ.P. 70, to: (1) enjoin the state to specifically perform the Settlement Order; (2) enjoin the state from violating the Order by enforcing amended § 505.3(h)(2)(v); and (3) hold the state in contempt of court. The Society claimed, *inter alia,* that the Order required consultation with the PAC

---

**2.** The regulation provides:

> (v) Charges for prescription drugs. (a) Maximum State reimbursement for a prescription drug is as follows:
> (1) payment for multiple source drugs must not exceed the aggregate of the specified upper limit[s] set by the federal Health Care Financing Administration (HFCA), plus a dispensing fee, for a particular drug; and

> (2) payment for brand name drugs and other multiple source drugs not covered by clause (1) of this subparagraph will be the lower of:
> (i) the estimated acquisition cost plus a dispensing fee; or
> (ii) the provider's usual and customary price charged to the general public.

N.Y.Comp.Codes R. & Regs. tit. 18 § 505.3(h)(2)(v) (1988).

before "consideration, promulgation, implementation and enactment of" the amended regulation. At a February 29 hearing before Judge Duffy, the state responded that the amendments were outside the scope of the Order. The state further argued that the Society had made it impossible for Social Services to consult with the PAC because the Society had: (1) requested that the PAC be dissolved and reconstituted; (2) delayed in submitting nominations for the reconstituted PAC; and (3) first informed the state less than 60 days before the regulation was to become final that the Society believed the PAC should address it.

In an order dated February 29, Judge Duffy restrained the state "in any manner, either directly or indirectly, from violating the terms of the Stipulation of Settlement entered between the parties and from enforcing 18 NYCRR 505.3(h)(2)(v)," and made his order effective "until further [o]rder of this Court."[3] On appeal, the state raises substantially the same arguments as raised before the district court. We affirm.

### DISCUSSION

A consent order, although "no mere contract," *New York State Ass'n for Retarded Children v. Carey*, 596 F.2d 27, 37 (2d Cir.1979), "is to be construed for enforcement purposes as a contract," *Taitt v. Chemical Bank*, 810 F.2d 29, 32 (2d Cir. 1987), because it has "many of the attributes of [an] ordinary contract[ ]," *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 236–37, 95 S.Ct. 926, 934, 43 L.Ed.2d 148 (1975). The parties to such an order "waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation." *United States v. Armour & Co.*, 402 U.S. 673, 681, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971). Thus, a consent order "normally embodies a compromise" whose scope "must be discerned within ... [the] four corners" of the order, *id.* at 681–82, 91 S.Ct. at 1757–58.

Interpretation of a written agreement becomes a factual inquiry into the parties' intention only when the language of that agreement is ambiguous as a matter of law. *See Gomez v. American Elec. Power Serv. Corp.*, 726 F.2d 649, 651 (10th Cir. 1984). Where the parties' intention is clear from "'the four corners of the instrument,'" no ambiguity exists requiring a factual inquiry into intention, and interpretation is a matter of law. *Leslie Fay, Inc. v. Rich*, 478 F.Supp. 1109, 1113 (S.D.N.Y. 1979); *see Painton & Co. v. Bourns, Inc.*, 442 F.2d 216, 233 (2d Cir.1971). Because we believe that the language of the Settlement Order is a clear expression of the parties' intention here, we must determine whether appellants are entitled to the relief granted to them by Judge Duffy.

### 1. *Scope of the Settlement Order*

The state argues that its implementation of AUL through amended § 505.3(h)(2)(v) does not come within the scope of the Settlement Order, and that even if it did, it falls outside of the PAC consultation and notice provisions of ¶ 6. The state contends that the Order is limited only to the *administration* of EAC pricing and that ¶ 6 applies only to changes in actual pricing, or in how prices are calculated, under ¶ 5 of the Order for drugs pharmacists purchase directly from manufacturers ("direct purchase drugs").

However, the scope of neither the Order in general nor ¶ 6 in particular is as limited as the state suggests. Although much of the Order addresses the preparation, distribution and notification of EAC price lists, several of its provisions go much further. Paragraph 9 deals with an increase in the dispensing fee, which is independent of EAC. In ¶ 10, the state, *"[n]otwithstanding* any term or condition of th[e] stipulation"* (emphasis added), reserved the right to use any reimbursement methodology subsequently mandated by federal law. Under ¶ 11, the state agreed to use "an appropriate procedure with a methodology

Its first meeting was held on March 23, 1988.

as similar as practicable" to the EAC procedures outlined in the Order, should performance of those procedures "become illegal or precluded as a result of litigation." Most important, ¶ 6 itself is not limited to EAC pricing. As to the PAC, ¶ 6 provides that "[t]he Department *shall meet* with this Committee ... for purposes of seeking its advice in matters relating to the *pharmaceutical industry, including but not limited to all matters encompassed in this stipulation*" (emphasis added). The state's unduly narrow interpretation of the Settlement Order thus flies in the face of its express language.

Nor is there merit to the state's restrictive interpretation of the circumstances under which ¶ 6 requires consultation with, and notice to, the PAC. The reach of ¶ 6 is not limited to changes in the pricing mechanism set out for direct purchase drugs in ¶ 5. Although ¶ 6 expressly states that the PAC "shall be consulted by the Department in regard to the procedures set out in" ¶ 5, it also provides that Social Services will notify the PAC "of *any* proposed changes in pricing or pricing methodology" (emphasis added), without restriction merely to ¶ 5 pricing, *and* "to present for the Committee's consideration the basis for any such changes." The state's response to the new federal regulations—eliminating from the state regulation the EAC provision for MSDs—certainly is a change in pricing methodology under ¶ 6. Moreover, the state's implementation of the AUL limitation itself clearly affects both pricing and pricing methodology. "[U]nder the final rule" which HHS adopted, state agencies are "required for purposes of [f]ederal financial participation ... to adhere to the upper limits set by the adopted approach," 52 Fed.Reg. 28,649 (1987), such that "the maximum amount of [s]tate drug expenditures that would qualify for FFP could not exceed, in the aggregate, the upper limit of payment," *id.* By limiting the aggregate amount of prescription expenditures qualified for FFP, the new federal regulation both sets a *de facto* limit to the EAC per-drug price under ¶¶ 4 and 5 and affects how a state agency that desires to qualify for FFP calculates drug price for prescrip-

tion reimbursement. Thus, even if we agreed with the state's interpretation of the scope of ¶ 6, the new regulation's effects on direct purchase drug pricing would require notice to, and consultation with, the PAC under the express language of the Order.

### 2. *Applicability of ¶ 10*

The state also claims that ¶ 10 makes the Settlement Order inapplicable to its implementation of AUL through the new regulation. This argument fails on two grounds. First, AUL is not a "methodology for determining reimbursement ... mandated by [f]ederal law or [r]egulation or by [s]tate law." Even if the state is correct in asserting that use of the EAC methodology would cause reimbursement to pharmacists to exceed AUL, *see* N.Y.St.Reg. 39 (Feb. 17, 1988), HHS has never mandated state adoption of AUL as a methodology for calculating prescription reimbursement payments. To the contrary, HHS has declared that it "would not expect a [s]tate agency to adopt directly the upper limit methodology as a payment method because it does not gear payments to markups appropriate to the actual costs of acquiring and dispensing these drugs," 52 Fed.Reg. 28,655. In fact, AUL is intended only as a "federal upper limit standard ... applied on an aggregrate rather than on a prescription specific basis," *id.* at 28,653, that establishes "the maximum amount of [s]tate drug expenditures that would qualify for FFP," *id.* at 28,649. HHS emphatically stated in its Notice of Final Rule:

> We want to emphasize that as a result of our adopting aggregate limits as the upper limit standards, [s]tate agencies are encouraged to exercise maximum [s]tate flexibility in establishing their own payment methodologies. We do not intend that our adoption of the formula approach to set limits for multiple source drugs be construed as an indicator of the [f]ederally preferred payment system. The use of the formula approach is primarily due to the straightforward application and administrative ease in setting upper limits. We encourage [s]tate

agencies to establish any program that will substitute lower-priced alternatives for drugs.

*Id.* at 28,653. Thus, while the state must assure HHS that "payment levels under its payment methodology will not exceed the upper limits established" under AUL, this merely makes AUL a mandatory *limitation* —a cap—on the amount of reimbursement yielded under any methodology that is eligible for FFP.

The state nonetheless contends that AUL is mandatory here because to maintain the EAC approach "would have resulted in loss of federal funds," N.Y.St.Reg. 39 (Feb. 17, 1988). However, there certainly is no showing in the record to support this allegation. Moreover, ¶ 10 applies only to methodologies made mandatory by HHS, not by a practical concern for obtaining maximum reimbursement. If Social Services found difficulty in complying with both the Order and those demands made under the new federal regulations, it should have moved for a modification of the Order in the district court.

Second, even if AUL came within the reservation of ¶ 10, nothing in that paragraph or in any other provision of the Settlement Order relieves the state from compliance with the notice and consultation provisions of ¶ 6. In ¶ 10, the state "expressly reserve[d] the right to *use* " any federally mandated methodology "[n]otwithstanding any term or condition" of the Order. The state did not thereby reserve the right to ignore the PAC and circumvent its obligations under ¶ 6. Although the PAC in this instance, or in any other instance under the Order, could not veto the

adoption and implementation of a regulation by Social Services, it still has the right under ¶ 6 "to consider the appropriateness of such change[s] and to present its views to the Department," which must then "consider and respond to those views."

Such dialogue might have proved particularly important in this instance because the federal provision for physician override, which excepted from AUL the disbursement of a specific brand name drug certified by a physician as medically necessary, was rejected by Social Services, *see* N.Y.St. Reg. 39 (Nov. 18, 1987), despite "predominantly negative" commentary on this rejection from other quarters, *see id.* at 40 (Feb. 17, 1988). The state "fe[lt] confident" that New York's generic drug substitution law sufficiently ensured that AUL would "not impinge upon a physician's right or ability to determine that, for the welfare of the patient, a particular drug is required," *id.* However, payments under the *federal* override provision are "not ... included in the calculation for compliance with the upper limit for multiple source drugs," but instead are subject only to "the upper limit for all other (non-listed) drugs," 52 Fed. Reg. 28,652. With such (presumably more costly) prescriptions absent from the AUL tallies, the state might have found a way to maintain substantially the EAC methodology and remain within federal upper limits.[4]

### 3. *Inequitable Conduct*

■ The state claims that Judge Duffy abused his discretion by granting appellees specific performance of the Settlement Order because appellees' "inequitable con-

---

4. It should be noted that such an accommodation would have brought the state into compliance with another provision of the Settlement Order which appellees contend was violated. Paragraph 11 of the Order provides that the Department

> is committed to and shall make every reasonable effort to effectuate the procedures outlined [in the Order] ... to make a reasonable determination of the prices commonly and currently paid by providers. However, should such performance become illegal or precluded as a result of litigation ... [the Department] shall make every reasonable effort to utilize an appropriate procedure with a

> methodology as similar as practicable to the procedure outlined [in the Order] ..., consistent with [f]ederal law and [r]egulations and [s]tate law and existing [r]egulations and such [r]egulations as may be necessary to effectuate this stipulation.

Because the state never gave the PAC an opportunity to comment on the proposed implementation of AUL through the amended regulation, it is difficult to see how the state fulfilled its obligation to "make every reasonable effort to utilize an appropriate procedure with a methodology as similar as practicable" to the former EAC procedures.

duct" had "disabled the agency" from complying with the Order. Specifically, the state argues that its failure to meet with the PAC was caused by appellees' failure to (1) nominate new members for the PAC after they had requested its reconstitution and (2) give the Department timely notice of their "conclusion" that the amendment to the regulation was subject to the notice and consultation provisions of ¶ 6. These claims border on the frivolous.

First, although appellees indeed requested dissolution and reconstitution of the PAC, they did so because the Chairman refused to call a meeting and had not called one in over a year. Having acceded to appellees' request to dissolve the old PAC, the state had the duty to reconstitute it as quickly as possible to remain in compliance with the Order.

Second, appellees' response to the state's call for nominations in no way excuses the state from meeting its obligations under the Order, even if, as the state alleges, appellees did not send the name of their last nominee to Social Services until November 19, 1987. The Settlement Order makes the *state* responsible for establishing the PAC. If the state believed that appellees were not acting with sufficient alacrity, it should have brought the matter before the district court. Regardless, appellees' initial response to the state's call for nominees—six names submitted on September 30—was more than enough for the state to make substantial immediate progress in reconstituting the PAC. Nor is there any justification for appellees' nominees not to have been approved long before the new regulation became final. As the state conceded in the district court, approval of PAC nominees requires only that Social Services verify in writing with the State Board of Pharmacy and the State Controlled Substances Bureau that the nominees are licensed, have no infractions, and have no charges pending against them. Surely such a straightforward inquiry reasonably should not have taken from September or November 1987 until March 1988 to complete.

Finally, appellees had no obligation under the Settlement Order to notify Social Services that they considered proposed changes in § 505.3(h)(2)(v) to be an issue which the Order requires to be presented to the PAC. Paragraph 6 of the Order clearly places the burden squarely on the state to provide the PAC with notice and to initiate consultation with it. Appellees were, and are, under no duty to remind the state of the obligations it has incurred, and is legally bound to perform, under the Settlement Order.

## CONCLUSION

Having chosen settlement over "the time, expense, and inevitable risk of litigation," *Armour & Co.*, 402 U.S. at 681, 91 S.Ct. at 1757, the state was obligated to comply completely with all the terms of the Settlement Order or to seek its modification in the district court before taking action that otherwise would violate the Order. The state did neither in this case and thus now cannot seek successfully to be excused from its obligations. Accordingly, we affirm the order of the district court.

OAKES, Circuit Judge, dissents in a separate opinion.

OAKES, Circuit Judge (dissenting):

I respectfully dissent.

The major point of contention here is the scope of the Stipulation. The State claims that it referred only to calculation of reimbursement using the estimated acquisition cost ("EAC") methodology, so that it has no relevance to the "aggregate upper limits" ("AUL") methodology contained in new state regulations. The State also argues that it was required to adopt the AUL methodology by the new federal regulations, thereby triggering a provision in the consent order which [¶ 10] allows a "mandated" change. Judge Miner's careful opinion takes a broader view of the consent decree, holding that these changes are not mandated by the new federal regulations and that the State has failed to maintain a Pharmacists Advisory Committee ("PAC") as required by paragraph 6 of the consent decree.

The clear language of paragraph 6 of the consent order requires the Department of Social Services ("DSS") to meet with the PAC at least quarterly to discuss "matters relating to the pharmaceutical industry," not limited to the matters encompassed in the consent order. I agree that the State is in clear violation as to this requirement. However, I do not think that this failure necessarily dooms the new state regulation. If the new regulations were genuinely mandated by the federal authorities, the PAC's failure to meet would be only incidental, though to the extent that we view the consent order as setting up a flexible mechanism by which drug prices will be set, it may be more significant. But the consent order does not give the PAC any veto power; to the extent it is more than advisory, its power comes only from its ability to enforce (or get the Pharmaceutical Society to enforce) the consent order. So had the PAC been in session, it still could not have halted the enactment of the regulation without a court action.

It is true, as Judge Miner's opinion states, that the new federal regulations, as explained by HHS, were intended "only to set an upper limit on what the federal government would pay for pharmaceutical products while leaving to the states the opportunity to design a payment methodology that best suited their needs without federal intrusion." HHS Opinion letter at 2–3. And the preamble to the federal regulations noted that one of the goals was to provide the states with "increased flexibility" in devising their own reimbursement methodology. As such, the new regulations do not expressly mandate a change in methodology. However, they may do so indirectly, by setting reimbursement amounts which are lower than those the State is required to pay pursuant to the consent order. There is conclusory support for this argument in the affidavit of Mary Alice Brankman, a DSS official, who states that the department calculated that it would not receive enough under the new federal regulation to meet its obligations under the terms of the consent order. However, I think we need more than this. A remand to take evidence on this point would, in my view, be appropriate. At that time the district court could also explore the "Physician's Override" requirement discussed in the HHS Final Rule 147, 52 Fed. Reg. 28,652 (July 31, 1987), something which the parties so helpfully did not explore in their briefs.